# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION


UNITED STATES OF AMERICA,    )
                            )
        Plaintiff,      )
                            )
                            )   Case No.: 3:19cr2/MCR
                            )
                            )   Pensacola, Florida
                            )   June 14, 2019
        v.             )   1:08 p.m.
                            )
MICHAEL LEE DEPINE,       )
                            )
        Defendant.      )
_____)


## SENTENCING

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS,
UNITED STATES DISTRICT JUDGE
(Pages 1 through 111)


APPEARANCES:

For the Government:      DAVID L. GOLDBERG, ESQUIRE
                          United States Attorney's Office
                          21 East Garden Street
                          Pensacola, Florida  32502

For the Defendant:       DAVID L. MCGEE, ESQUIRE
                          MATTHEW P. MASSEY, ESQUIRE
                          Beggs & Lane
                          501 Commendencia Street
                          Pensacola, Florida  32502

                          GILBERT A. SCHAFFNIT, ESQUIRE
                          Law Offices of Gilbert A. Schaffnit
                          719 NE 1st Street
                          Gainesville, Florida  32601

1          PROCEEDINGS

2          *(Court called to order; Defendant present with counsel.)*

3          **THE COURT:**  Good afternoon.  This afternoon before the

4     Court is Mr. Michael DePine, who is here for sentencing.

5     Mr. DePine is represented by Mr. McGee, Mr. Schaffnit -- good

6     afternoon -- and Mr. Massey, welcome.

7          The Government is represented by Mr. Goldberg.  From

8     Probation we have Officer Pearce and Alvarez in the courtroom

9     as well.

10         Normally my procedure in a sentencing is to state on

11    the record what the Guidelines calculation is from a

12    defendant's Presentence Report, and then I'll hear from defense

13    counsel, usually standing objections that you have.  I'll hear

14    from the Government regarding its review of the report.  I then

15    hear from both sides, including the Defendant himself, if he

16    wishes to speak in allocution, but I hear from the attorneys in

17    terms of the 3553(a) factors.

18         Here, let me first ask if there's going to be any

19    evidence presented in the hearing today?

20         **MR. MCGEE:**  We do have a witness, Your Honor,

21    Dr. Suzonne Kline, who has done a psychological probe which was

22    attached to our sentencing memo.

23         **THE COURT:**  That would be, then, in relation to the

24    3553(a) factors?

25         **MR. MCGEE:**  Yes, ma'am.  And it seems logical to me to

1    put her on first because we will refer to her in various other

2    areas.

3            **THE COURT:**  Before we do that, let me just settle the

4    issue of the calculation.  I don't believe there was any

5    objection to the Guidelines calculation.

6            **MR. MCGEE:**  There are a couple of factual statements

7    if there that we objected to, but they did not affect the final

8    number of calculation.

9            **THE COURT:**  So then do both sides, Defense and the

10   Government, agree that the total offense level for Mr. DePine,

11   pursuant to the calculation made in the PSR, is a 40 with a

12   Criminal History Category of I, with a recommended advisory

13   range under the Guidelines of 292 to 365 months?

14           **MR. MCGEE:**  Yes.

15           **MR. GOLDBERG:**  Yes, Your Honor.

16           **THE COURT:**  All right.  And that calculation, for the

17   record, was done pursuant to Count Four.  There was a

18   multiple-count adjustment resulting in the total offense level

19   that I just mentioned.  Both sides agree with that.  Then we

20   really don't need to discuss the Guidelines in terms of the

21   calculation anymore.

22           We can proceed with your witness, if you wish.

23           Mr. Goldberg, any evidence from you?

24           **MR. GOLDBERG:**  No, Your Honor.

25           **THE COURT:**  All right.  Go ahead.  We'll go ahead with

1  your witness.

2          **MR. MCGEE:**  Mr. Schaffnit will handle the witness,

3  Your Honor.

4          **THE COURT:**  All right.  Mr. Schaffnit.

5          **MR. SCHAFFNIT:**  Good afternoon, Your Honor.

6          **THE COURT:**  Good afternoon.

7          **MR. SCHAFFNIT:**  Your Honor, with permission of the

8  Court, if the court security officer could call Dr. Suzonne

9  Kline, K-l-i-n-e?

10          **THE COURT:**  I don't know that we have anyone that can

11  go and --

12          **MR. SCHAFFNIT:**  Actually, she's in the courtroom.

13          **THE COURT:**  Oh, very good.

14          Come on up, ma'am, please.

15          **SUZONNE KLINE, DEFENSE WITNESS, DULY SWORN**

16          **MADAM CLERK SIMMS:**  Be seated.  Please state your full

17  name and spell your last name for the record.

18          **THE WITNESS:**  Dr. Suzonne Kline, S-u-z-o-n-n-e,

19  K-l-i-n-e.

20          **THE COURT:**  All right, Mr. Schaffnit, when you're

21  ready.

22          **MR. SCHAFFNIT:**  Thank you, Your Honor.  May it please

23  the Court?

24          **THE COURT:**  Yes, sir.

25

1        **DIRECT EXAMINATION**

2   **BY MR. SCHAFFNIT:**

3   Q.   Dr. Kline, are you ready to proceed as well?

4   A.   Yes, I am.

5   Q.   Dr. Kline, having stated your name, would you tell the

6   Court your occupation.

7   A.   I'm a licensed psychologist in private practice.

8   Q.   And you're licensed in the state of Florida?

9   A.   Correct.

10  Q.   How long have you been a licensed clinical psychologist?

11  A.   Since 2005.

12  Q.   And if you would, tell the Court a little bit about your

13  education.

14  A.   I attained my doctorate from Argosy University.  I did my

15  internship at Florida State Hospital, my postdoc residency at

16  Florida State Hospital, which is forensically -- it's a

17  forensic mental health facility working with forensic mentally

18  ill offenders.

19       Do you want anything else about the education or as far as

20  experience?

21  Q.   Just your training and experience.

22  A.   So I've been working in psychiatric hospitals with mentally

23  ill populations since 1993.  When I came to Florida in 2001 is

24  when I started working exclusively with forensic mental health,

25  so dealing more with competency issues, risk assessments, that

1    type of thing.

2         In 2006 I started working with Florida's Sexually Violent

3    Predator Program which people refer to it as the Jimmy Ryce

4    program.  So since that time --

5    Q.   Let me stop you there.  Is that the program for civil

6    commitment that is located in Arcadia, Florida, for individuals

7    that have served their sentence and are subject to civil

8    commitment under Chapter 394?

9    A.   Correct, that is part of it.  The other part -- I was

10   appointed administrator in 2008, so I oversaw the entire

11   operation, which has its headquarters in Tallahassee.  So I had

12   a cadre of like 40 staff, and we handled all the screening and

13   evaluations of people referred to that program for the

14   commitment on the back end if the Court deemed them sexually

15   violent predators.  So we handled both the assessments and then

16   the treatment.

17   Q.   And how long did you do that?

18   A.   I was with the Jimmy Ryce program from 2006 until private

19   practice in 2012.

20   Q.   Focusing your attention on your training and experience

21   with respect to the federal court system, have you had an

22   opportunity to present to the United States Office of Probation

23   and Pretrial Services, the Administrative Office of the United

24   States Courts?  If you would, tell the Court a little bit about

25   your training and experience with respect to probation and

1    pretrial services officers.

2    A.    Sure.  I was contacted by U.S. Probation -- actually, the

3    Administrative Office of the U.S. Courts.  I'm still learning

4    all the acronyms.  I had been routinely training other

5    professionals, experts in the field on risk assessment,

6    evidence-based risk assessment, and in particular with internet

7    sex crimes or digital technology or digital mediated sex

8    crimes.

9         And they contacted me to conduct a series of training for

10   federal probation and parole and U.S. Courts on evidence-based

11   risk assessment particularly with sex offenders and then even

12   more so with the crimes of digital -- with digital media

13   involving like child pornography offenders, solicitation

14   offenders, travelers.

15   Q.    In those training sessions that you participated in for

16   probation and pretrial services offices, were they in 2017 and

17   2018?

18   A.    I believe so.  I believe that there were three of them:  In

19   Miami, Florida, in 2017; Detroit, Michigan, in 2017; and

20   Chicago, Illinois, in 2018.

21   Q.    So, if you would, tell the Court how long your practice has

22   concentrated and focused on risk assessment in the area of

23   either sexually violent predators generally or internet sex

24   offenders specifically.

25   A.    It's been -- my private practice started in 2012.  But

1    before that, I had been working with risk assessment and

2    exclusively with sexual offenders since 2006.  For the first

3    two years of the Sexually Violent Predator Program, I did

4    nothing but risk assessment and was a member of what they

5    called the multi-disciplinary treatment team.  So all I did was

6    review referral offenders for risk assessment.

7         Since my private practice, it's been almost exclusively to

8    -- it's exclusive to sexual offenders and mostly internet sex

9    crimes with some statutory sex crimes also and then also some

10   younger offenders.

11   Q.   And your practice is in Tallahassee, Florida, correct?

12   A.   Correct.

13   Q.   Can you tell the Court whether or not you are published in

14   the field of risk assessment?

15   A.   I am.  I have two published actually in risk assessment,

16   one in 2011 and one in 2012.

17   Q.   And have you ever testified in state or federal court as an

18   expert in risk assessment in sexual offender cases?

19   A.   I have in both state and federal, here in Florida but also

20   in Montgomery, Alabama -- sorry, it's escaping me -- Atlanta,

21   Georgia, and I think I'm leaving one out.  But prior to my

22   private practice, as administrator, I testified mostly for the

23   state or prosecution in individual Jimmy Ryce cases but also in

24   federal class action lawsuits.

25   Q.   I assume when you were the administrator of the Sexually

1    Violent Predator Program doing risk assessments, you were

2    primarily called by the State of Florida as an expert witness?

3    A.    Yes.

4    Q.    Do you have a rough idea of how many times you were

5    qualified as an expert in the courts of the State of Florida on

6    behalf of the state as an expert in risk assessment?

7    A.    I would say, in total, over twenty.  But that would include

8    also private practice.  And that's a conservative estimate just

9    because I'd rather be conservative.

10   Q.    And I know you and I have had cases in Gainesville and --

11   A.    Right.

12   Q.    -- we've had a case in the Northern District, Tallahassee

13   Division, with Judge Hinkle, and a case in the Jacksonville

14   Division with Judge Corrigan.

15         Do you have a rough idea of the number of times that you

16   have been qualified as an expert in risk assessment in the

17   courts of the Northern District of Florida?

18   A.    At least ten, probably closer to 15.

19   Q.    And I assume you've also testified, as I mentioned, in the

20   Middle District and the Southern District as well?

21   A.    Yes.

22   Q.    Have you ever been not qualified as an expert in the field

23   of examination and risk assessment for sex offenders either

24   when you testified on behalf of the state or the Government or

25   when you testified on behalf of the Defendant?

1  A.   No.

2          **MR. SCHAFFNIT:**  Your Honor, there has been a filing

3  done of Ms. Kline's -- Dr. Kline's curriculum vitae.  I assume

4  the Government has a copy.  I have a clean copy.

5          I don't have any further questions in the nature of

6  voir dire.  I would ask that the Court qualify Dr. Kline as an

7  expert in sex offender risk assessment.

8          **THE COURT:**  Mr. Goldberg, any voir dire?

9          **MR. GOLDBERG:**  No, Your Honor.  No objection.

10         **THE COURT:**  She'll be so qualified.

11         **MR. SCHAFFNIT:**  Thank you, Your Honor.

12 **BY MR. SCHAFFNIT:**

13 Q.   Dr. Kline, let me turn your attention to the case that

14 we're here about today, Michael DePine.  Did I ask you to

15 perform a risk assessment of Mr. DePine?

16 A.   Yes, you did.

17 Q.   And before conducting that risk assessment, did we have an

18 opportunity to go over the case?

19 A.   Yes, we did.

20 Q.   And can you tell me, in preparation for the eventual risk

21 assessment that you performed and thereafter, what materials

22 you reviewed, talking about the indictment, the Presentence

23 Report, sentencing memorandum, that kind of thing.

24 A.   So all of the material that you mentioned, I review all the

25 discovery information.  In particular cases like this, I like

1  to see the texting transcript or what I call chat logs, also

2  any internet browser history, which is why I rely a lot on the

3  PSI or PSR, however they refer to it, because it usually gives

4  a good description of the type of information that I'm looking

5  for.

6  I also look for collateral information, reports from

7  family, friends.  Third-party reports of functioning are

8  important in forensic assessment.  And then I also consult -- I

9  match the specifics of the characteristics for the material

10  that I reviewed with different bodies of research literature

11  depending on the individual and the case circumstances.

12  Q.  In terms of the facts of the case, I assume that you also

13  reviewed the indictment and the criminal complaint in this

14  matter?

15  A.  Correct.

16  Q.  So you're familiar with what the allegations were in the

17  criminal complaint as well as the charges as returned by the

18  grand jury in their true bill?

19  A.  Absolutely.

20  Q.  In this particular case, Mr. DePine's case, did you have an

21  opportunity to review any previous psychological evaluations

22  that might have been done?

23  A.  Oh, yes, I did.  In, I believe it was 2018 -- let me give

24  you the exact date -- it was August 29th, 2018, he had a

25  psychological evaluation related to bariatric surgery, and the

1    evaluation itself found depression and some other things, but I

2    also reviewed that report.

3    Q.    So it's my understanding that the psychological evaluation

4    was a required condition for Mr. DePine to qualify for the

5    bariatric surgery?

6    A.    Yes.

7    Q.    And you reviewed that evaluation?

8    A.    Yes.

9    Q.    And I realize it was directed more toward Mr. DePine's

10   psychological state with respect to the surgery and the

11   aftermath.  You mentioned that there was a diagnosis that was

12   made of Mr. DePine at that time?

13   A.    Correct, a diagnosis of depression and a binge eating

14   disorder.

15   Q.    And that occurred prior to his arrest in the instant case?

16   A.    Yes.

17   Q.    And any other materials that we haven't talked about that

18   you reviewed prior to taking the opportunity to do a clinical

19   interview and perform the testing?

20   A.    No, nothing except for outside of the social science

21   research literature.

22   Q.    Well, let's talk, then, about the evaluation itself.  Can

23   you tell the Court a little bit about how you do your

24   evaluations, the various sessions that you have, the duration

25   of your testing, and then we'll talk about the testing itself.

1    A.    Sure.  So I use the same standardized evidence-based risk

2    assessment regardless of the case or the offense.  And it

3    usually has four prongs to it, the first one being an in depth

4    psychosexual interview, just a detailed clinical forensic

5    interview with the client.  And with Mr. DePine, I conducted

6    his over two days.

7         So his total evaluation was probably 10 to 11 hours of

8    in-person.  Outside of that, there's probably double that

9    amount of time in scoring instruments and, again, pulling from

10   the research literature.

11        During the evaluation I also administer a cadre of forensic

12   assessment measures, all evidence based, some geared towards

13   sincerity or cooperation, which I think is important in cases

14   like this, other ones geared more towards forensic mental

15   health, a snapshot of their functioning, and then I use

16   actuarial measures.  That's a fancy term we use for

17   specifically designed instruments that are evidence based that

18   predict an individual's future risk or likelihood of committing

19   a future sex crime.

20        In addition to that, as we discussed, I review the

21   discovery prior to.  I usually also bring it with me, and that

22   way, if there's any discrepancy, I can talk about it with the

23   offender.  And then, lastly, I review the available research

24   literature, and I match it to the specifics of the case and

25   also to the charging documents.

1   So, for instance, in this case, the circumstances, which

2   I'm sure we'll talk about, from a forensic mental health point

3   of view fit more of a statutory sex crime.  But he was charged

4   with child pornography production, solicitation of a minor, and

5   so I also reviewed those bodies of research literature as well.

6   Q.   Let me stop you.  I think I know what you mean when you

7   talk about a statutory sex crime, but can you explain further

8   what you're talking about.

9   A.   Sure.  From -- again, I have to qualify it from a forensic

10  mental health point of view and not a legal point of view.  But

11  among researchers, we distinguish between different types of

12  offenses, and one of which being having consensual sex, to the

13  degree it's consensual with a minor of the age of this victim,

14  as opposed to a predatory sex offender who is preying on

15  prepubescent minors, let's say.

16  And so, one is looked at, even if socially unacceptable,

17  it's against social mores, it's illegal absolutely if acted

18  upon, but in a scientific research community it's not

19  considered deviant or abnormal or pathological, in general.  I

20  still give all of the tests to see if there's not something

21  underlying or motivating conduct, and in this case I did the

22  same thing.

23  Q.   And I assume that the testing that you did and the scoring

24  and all of the diagnostic tools that you use are compared with

25  the diagnostic criteria, the Diagnostic and Statistical Manual

1    of Mental Disorders, the 5th Edition?

2    A.   Correct.  They don't -- the DSM-5, the 5th Edition, does

3    not come with a, you know, suggested list of tools that you

4    use.  But absolutely.  So when we're assessing for anything, we

5    are always comparing it not only to the research literature but

6    also the diagnostic criteria.  So, yes.

7    Q.   And the term "pedophile" gets thrown around a lot in cases

8    like this.  What is the DSM-5 definition of "pedophilia," and

9    did you, again, advancing forward beyond the testing, did you

10   end up making any conclusion or diagnosis with respect to

11   whether Mr. DePine is or is not a pedophile?

12   A.   So, yes, to answer the question.  I did not find that he is

13   a pedophile or meets the diagnostic criteria for pedophilia or

14   what we call pedophilic disorder.  I didn't think that he would

15   going into the case, given my experience and training.  But,

16   you know, I've been surprised before, so again, I still do the

17   same structured assessment.

18        The definition is over a period of six months having

19   intense recurring either fantasies, interests, or behaviors of

20   prepubescent children, which is the most important or crucial

21   part of that pedophilic diagnosis.  So when we talk about

22   prepubescent, we're talking about people or minors that are

23   lacking the secondary sex characteristics, so it's before they

24   go through puberty, which is very different than a

25   postpubescent who might be fully developed.  And that's usually

1    one of the distinguishing factors is it's usually between --

2    for most it's usually defined as age 13 or less.  But again,

3    that varies.  You have to look at the individual victim because

4    some people mature earlier, some mature later.

5    Q.   So, if you would, tell the Court the four components that

6    you've identified with respect to the standardized

7    evidence-based risk assessment that you perform.

8    A.   So that would be the forensic interview, the detailed

9    interview four to five hours.  In his case, it was probably

10   more like six or seven hours.  The review of the collateral

11   information and discovery.  In particular, I usually require

12   the PSI or the PSR before I make my recommendations.  The

13   information in there is key to my assignment.

14   Q.   Let me stop you.  You say "usually."  In this case did you

15   wait until you received the PSR before you made your clinical

16   impressions and findings?

17   A.   Yes.

18   Q.   Go ahead.

19   A.   So it's critical to me to receive that before I render my

20   findings.  And then I also use objective testing, psychological

21   testing, and a cadre of risk assessment measures that are used

22   in sex offender risk assessment around the world.  And then

23   finally I do a review of the social science research literature

24   specific to that case and that offender's individual

25   characteristics.

1    Q.   And without going into the details, because it's in your

2    report, did you identify for the Court all of the studies that

3    relate to the areas that are outlined in your report with

4    respect to risk assessment?

5    A.   Yes.  I can't say it's an exhaustive list because there are

6    so many and it would be a 100-page document, there's so many

7    studies out there now.  So I tried to select the ones that were

8    most similar to his case matching, again, his characteristics

9    and the circumstances of the crime.  But even if they didn't,

10   because of the nature of the charges, I also wanted to include

11   that research literature as well.

12   Q.   And are there recognized standardized tests that are

13   administered by forensic psychologists to individuals such as

14   Mr. DePine that are charged with these offenses?

15   A.   As far as the Static-99?  Are you talking about actuarials?

16   Q.   That's one of the them, but the Hare test, the MMPI?

17   A.   Oh, yeah.  Sorry.  So in --

18   Q.   Can you tell the Court which ones are commonly utilized and

19   which ones you did in Mr. DePine's case?

20   A.   Absolutely.  And I just wanted to clarify that they're not

21   just for sex offender risk assessment.  They're used in any

22   evidence-based risk assessment.  And these are the most common

23   ones that are used, which is why I select them.

24        So I used what we call the MMPI, which is the Minnesota

25   Multiphasic Personality Inventory, Second Edition.  And that's

1   probably the most well known, well researched psychological

2   instrument in forensic mental health.

3   Q.   Briefly what does that tell you?

4   A.   Well, it's usually primarily used for two reasons and found

5   to be reliable for both.  And one is, it gives a very good

6   snapshot of the individual's personality functioning and mental

7   health functioning at that time.  The other reason is, it has

8   inherent validity indicators, which are very important to

9   assess their testing style, as people would have motivation to

10  not be as honest as they might want to be.

11       So -- and these are -- the validity indicators are, again,

12  objective.  So it's not something that's in the subject's

13  awareness when they're taking the test.  And just a reflection

14  of the instrument, one of the reasons why I use it is that it's

15  used many times by the Department of Defense and CIA for

16  granting secret clearance.

17  Q.   So when you say "validity," this is in connection with an

18  individual, for instance, trying to portray themselves in a

19  false favorable light?

20  A.   Absolutely.

21  Q.   And what was the measure validity with respect to the MMPI

22  in Mr. DePine's case?

23  A.   Consistent with a lot of the other evidence that he was

24  being very open, honest, and cooperative.

25  Q.   And can you discuss for the Court the Abel Assessment for

1    Sexual Interest, basically a little bit about what it -- how

2    it's administered, how it's scored, whether you score it or

3    whether it's scored in Atlanta, and what it's designed to

4    assess?

5    A.    Sure.  So the Able Assessment of Sexual Interest is a

6    comprehensive not only assessment tool but also a treatment

7    tool that they use in sex offender management and treatment.

8    And it's designed specifically to measure an individual's

9    sexual interest.  And it's also evidence based, so it's

10   objective.

11        One of the reasons I like it is because there are

12   components also of this.  It's a computerized test.  And the

13   subject is shown a series of non-nude images depicting various

14   people of various ages up through middle adulthood and they're

15   to rate their sexual interest.

16        What they don't know and is outside of their awareness is

17   that the test is actually measuring how long they gaze at a

18   certain image or where they might gaze, and so it's actually

19   using visual reaction time, which is found to be a better

20   correlate or predictor, or however you want to say it, a better

21   marker of pedophilia than even the penile plethysmograph, which

22   is PPG, which is more of a draconian -- they still use it, but

23   this is a much better measure, in my opinion.

24   Q.    And this test was created by Dr. Gene Abel in Atlanta who

25   primarily deals with victims?

1    A.    Correct.  So the scoring is -- it's a computerized test,

2    and so the scoring is -- it's -- he gets assigned to a random

3    or anonymous number so that they don't know any of the personal

4    specifics of the case.  But then it's submitted through the

5    computer and they score and they provide the sexual interest

6    slides, is what we call them, to show where an individual was

7    measuring their sexual interest.

8    Q.    And Mr. DePine was in custody during the time these tests

9    were administered, correct?

10   A.    Correct.

11   Q.    So he's not able to Google, for instance, what an Abel

12   screen is and try and find a way around it?

13   A.    No.

14   Q.    How about the Hare Psychopathy Checklist-Revised, can you

15   tell the Court a little bit about that test?

16   A.    Sure.  Another important test, especially in forensic

17   mental health.  It measures a severe variant of antisocial

18   personality disorder.  I usually refer to it as antisocial

19   personality on steroids.  So this is somebody you think of when

20   you think of your violent offender with a criminal mentality,

21   very shallow or superficial, kind of lacking that moral

22   compass.

23        So this is the world's best test for that particular

24   condition of psychopathy, but also measures antisocial

25   personality disorder as it comes up under the psychopathy

1  umbrella.  And it's been used for years and found to be highly

2  reliable.

3       And the reason why it's so important is because two of the

4  most significant markers or predictors of future sexual

5  behavior are sexually deviant interest and also antisocial

6  personality disorder.  And I would even go so far as I look for

7  just components of that, the criminal thinking, association

8  with like-minded peers.  I look for any signs that would be a

9  symptom of that.

10      And in this particular test, I believe he scored a 5 out of

11  a total of 40 points.  And Hare, the developer, suggests a

12  score of 30 as the cutoff for designating somebody as a

13  psychopath or to have psychopathic characteristics.

14      And as a reference point, usually in prison populations

15  scores in the low to mid twenties are common.  So his score is

16  well below that.  So not very typical of the neurotypical

17  offender, I guess you could say, and more reflective of an

18  individual who is more prosocial.

19      And again, it was consistent with other testing, like the

20  MMPI that did not show any criminal orientation or behavioral

21  markers of psychopathy or antisocial personality disorder.

22  Q.   And then, finally, the Static-99R, would you describe why

23  it was used in this particular case and what the test is

24  designed to measure?

25  A.   Sure.  So this is probably the most well known, well

1    researched sex offender -- specifically sex offender risk

2    assessment tool in the world.  And I used it in this case -- I

3    use it whenever I can because it's so well known and it's

4    reliable, and in this case because there was contact between

5    him and the victim.

6         A lot of times with internet sex crimes, there may be talk

7    of contact, but not actual contact.  And so there's debate in

8    the literature as to whether or not to use the Static.  A lot

9    of times I will still use it.  But in this case it absolutely

10   required it because there was contact between the offender and

11   the victim.

12        And in that case -- and it measures variables that are very

13   consistent and reliable markers of future recidivism, and it

14   gives you projected or likelihood -- estimates of their

15   likelihood to commit a sexual crime within a specified time

16   period.

17        And in his case, he scored a -2 out of a range of -3 to 12.

18   So it put him in the lowest risk category as far as his risk

19   for recidivism in the future, and I believe that was at 1.3

20   percent at five years, which is --

21   Q.   I'm sorry, 1.3 percent recidivism over five years?

22   A.   At five years, correct.

23   Q.   At five years?

24   A.   So that's cumulative.  And I believe I mentioned it in the

25   report because there's a lot more research coming out all the

1    time and there's a newer body of research that's looking

2    specifically at sex crime recidivism, the impact of

3    incarceration, and it's also looking at it in a general

4    population, something that we haven't really done before

5    because we usually pull from offenders.

6        And with the studies, in general, they found that the

7    estimated likelihood of any individual from the general

8    population committing a first time spontaneous sex offense is

9    about 1 to 3 percent, which is helpful to know, because then in

10   the criminal justice system a good way of defining low risk

11   independent of those studies would be somebody that may have a

12   comparable risk estimate to a non-offender, a general -- a

13   member of the, you know, general population.

14       And so, again, several different measures and in different

15   ways of looking at his specific circumstances yield very

16   similar results.  So his estimated recidivism is similar to

17   that projected for a non-offender.

18   Q.   So briefly with respect to the MMPI, I assume from your

19   testimony you've found the results to be valid.  What did the

20   results of the MMPI tell you about Mr. DePine and his risk of

21   potential recidivism going forward?

22   A.   So I used the MMPI -- it gives a good snapshot, again, of

23   mental health, and so there were a lot of issues that I didn't

24   really address them in the report because they didn't really

25   relate to risk, per se.  It was very consistent with his

1    diagnosis of depression and something that he should be

2    provided mental health services for.  But I usually use it --

3    what I'm looking for, again, are the symptoms of criteria for

4    antisocial personality disorder or that might come up under

5    psychopathy, criminal mindedness, you know, juvenile

6    delinquency, problem with peer relationships, truancy.  I'm

7    looking for those type of things.

8         And in his case, he did not score high on any of those

9    indices or those clinical scales.

10   Q.   Based on the results of the MMPI and the studies that you

11   cite in your report, given Mr. DePine's diagnosis of depression

12   and other factors, do you believe that the Bureau of Prisons

13   needs to provide Mr. DePine with sex offender counseling or

14   some other psychological counseling?

15   A.   In my professional opinion, no, he would not be an

16   appropriate candidate.  If he were coming through my program,

17   we would not select him for what they call

18   sex-offender-specific treatment.  Because his factors -- the

19   factors that contributed to his conduct are different than

20   those, say, like somebody who suffers from sexual deviancy or

21   is diagnosed with pedophilia or paraphilia or rapist.

22        So he would need more interpersonal skills, training,

23   things that are more of a psychological nature less than

24   deviancy, but also relate more to that interpersonal dynamic

25   which contributed to his offense because he was, you know,

1    isolative and socially withdrawn.

2    Q.   And then the second test, the Abel screening, based on the

3    results of the computerized testing, did I hear you correctly

4    -- did you score the Abel or was it scored in Atlanta?

5    A.   No.  It's provided to -- so I did not score it.  I

6    interpret the results.  But you have to be trained, which is

7    why you can't -- not everybody uses it.  There's a training

8    process involved.  And his were within normal limits for an

9    adult heterosexual male.  There was no deviancy or sexual

10   deviant interest identified or measured by the instrument.

11   Q.   So, as I understand it, Dr. Abel's test is proprietary and

12   you have to be licensed and you submit the data randomly and

13   then it's scored up in Atlanta, correct?

14   A.   Correct.

15   Q.   With respect to the third test that we talked about, the

16   Hare Psychopathy, you mention in your report in several places

17   the importance of antisocial or deviant behavior in relation to

18   risk assessment.

19        What were your findings based on the Hare Psychopathy test

20   results in Mr. DePine's case?

21   A.   Well, not only those results, because I rarely rely on one

22   point of information, but consistently across testing he scored

23   low or didn't score at all on the measures that were looking

24   specifically for psychopathy or antisocial personality

25   disorder.

1          So, in other words, in the forensic mental health

2    profession among experts there's always the importance of

3    distinguishing between two major types of offenders; one that

4    is more circumscribed where the conduct might be either an

5    isolated incident or a period of time that is outside or

6    uncharacteristic of their normal or lifetime conduct -- in my

7    opinion, this case would fit that -- versus the life perpetual

8    offender, violent offender, or recidivistic sex offender.

9          And there are markers that we look for for that, you know,

10   previous violent crime being one of them, younger age of

11   violent offense.  Even with the child pornography charges, the

12   lack of having child pornography depicting adolescents would be

13   a marker.  Things that we might not even think would make sense

14   but that have been identified in the literature as being

15   markers, and so I assess for all of those.

16         And in this case, there was no readily identifiable marker

17   that would suggest an increased risk of future recidivism,

18   sexual or otherwise.

19   Q.   And then, finally, I think you mentioned where Mr. DePine

20   scored on the Static-99.  Can you give the Court just, again, a

21   reference with respect to how Mr. DePine scored in reference to

22   other individuals charged in similar circumstances?

23   A.   Sure.  So a score of -2 places him in the below average

24   risk category.  And the term you're supposed to use for that is

25   "very low risk."  I prefer just low or high risk but -- so very

1   low risk.  And their projected recidivism rate within five

2   years is estimated to be about 1.3 percent.

3   Q.   Let's talk a little bit about the protective factors that

4   you identify with respect to risk assessment.  Can you describe

5   what the term means and how you utilize it in your diagnostic

6   criteria?

7   A.   Sure.  One of the drawbacks of using or just relying on the

8   Static alone, or any actuarial, is that it doesn't take into

9   account protective factors.  It only looks at factors that

10  raise somebody's risk of offending.  And in the last five to

11  ten years especially there's been a surge of empirical

12  investigation into protective factors that can have just as

13  much of an impact on somebody's likelihood of committing a

14  future sex crime.

15  Q.   Give the Court some examples of protective factors.

16  A.   I would say the three strongest ones at this time would be

17  age, employment history, and usually marital status, and that

18  can mean either divorce, separated.  They had to have had a

19  period of time of being with another person and then end the

20  personal relationship.

21  Q.   And how is age determined by the studies to be correlative

22  to risk?  Mr. DePine is, I believe, 64 years of age?

23  A.   Correct.

24  Q.   What do the studies tell you and what does the testing tell

25  you about the likelihood of recidivism of Mr. DePine at his

1   age?

2   A.   So the studies are very conclusive about the age -- the

3   issue of age and recidivism.  And so age -- risk for recidivism

4   of any crime, but in particular sex crime, decreases with

5   advancing age, usually about two percent per year.  But again,

6   I want to be cautious in saying that because it needs to be

7   specific to the individual and the circumstances.  But, in

8   general, it is an inverse relationship.

9        And then usually anything over age 60 -- I do not believe I

10  have reviewed any research where there's been a recidivist

11  after that age.  And I believe several -- and I might have used

12  it in the report -- of the well known people in the field of

13  sex offender risk assessment, like Thornton, would be one of

14  them, or Carl Hanson, I believe they even quoted something to

15  the effect that there was no recidivist found after age 60, so

16  this is a minimal risk group.

17  Q.   And Mr. DePine has no prior criminal record.  How is that

18  correlated to risk?

19  A.   It's very important to risk.  So the best predictor of

20  future behavior is relevant past behavior.  And having a

21  history of a previous crime, in general, but in particular a

22  sex crime, would raise their risk of offending.

23       Again, you have to look for the individual circumstances

24  and specifics of any case, but in general a previous history of

25  a sex crime would put them in a different group or level to

1    begin with when you're assessing their risk as opposed to

2    somebody with no history.

3         And the majority of people who commit sex crimes are

4    similar to Mr. DePine, first-time sex offenders.  It's one of

5    the public misperceptions that sex offenses are committed by

6    predators mostly.  But, in general, they're usually first-time

7    sexual offenders, for lack of a better word, and they

8    constitute anywhere from like 85 to 95 percent of the

9    population of committing sex crimes.  So --

10   Q.   And when you examined Mr. DePine's Presentence Report, I

11   assume you looked at factors such as offenses that are non-sex

12   offenses for which maybe there were no convictions that

13   nonetheless might be indicative of antisocial behavior like bar

14   fights or other forms of -- you know, road rage, that kind of

15   thing?

16   A.   Correct, correct.

17   Q.   And did you see anything in the Presentence Investigation

18   Report, again, for anything in Mr. DePine's background which

19   may not be reflective in the score that he was given that would

20   be indicative of any risk?

21   A.   I didn't find anything that would be indicative of risk.  I

22   found things that public perception might intuitively think are

23   indicative of risk that -- I don't know if I addressed all of

24   them in the report, like chat logs or nature of the language,

25   search terms is another one, there's a lot of research on that.

1    I believe that he used dating sites to -- I think they're maybe

2    20 year olds.  But again, so these things might be suggestive,

3    if one was not an expert in the field of social science

4    research.  But there's nothing correlative to what I reviewed

5    and risk, to my knowledge.

6    Q.    And what about the history of employment, stability of

7    employment, how is that correlative to risk?

8    A.    So that's very important.  Again, employment stability is a

9    marker -- or a significant buffer of future recidivism or

10    future risk in general.  And in studies particularly of child

11    pornography offenders and even more so solicitation offenders

12    or solicitation of a minor, lack of employment or low education

13    was related to recidivism, whereas consistent employment,

14    higher education, or marital status was related to lower

15    recidivism.  So they act as buffers, lowering somebody's risk

16    for recidivism.

17    Q.    And then, with respect to Mr. DePine's social support

18    system -- friends, family, his social interaction -- again, we

19    talked about the factors relating to the Hare Psychopathy and

20    Mr. DePine's diagnosis of depression.  How is the social

21    support system of assistance to Mr. DePine in terms of being

22    correlative to risk?

23    A.    So it would serve as a buffer or a mitigating factor to his

24    risk.  So a strong social support system has been found to be a

25    very strong buffer to risk of future recidivism.  And it makes

1   sense given that another marker of future crime in general,

2   violent crime in particular, would be somebody's association

3   with like minded peers or peer influence.

4      So somebody's social circuit is very important.  And he has

5   a positive social support system, which would only serve to

6   help him and lower his risk.

7   Q.   And finally, how about what we call the ACEs, the child

8   childhood adversity situation, can you describe to the Court

9   what we're talking about and how it's correlative to risk?

10  A.   Sure.  So there is a lot of research regarding adverse

11  childhood experiences, and that would be childhood sexual

12  abuse, emotional abuse, physical abuse, neglect, any of the

13  adverse events in childhood.  And the research is looking into

14  their correlation with future sexual recidivism.  And they're

15  all correlated to some degree with future recidivism in general

16  and definitely sexual recidivism, and in particular history of

17  childhood sexual abuse.

18     In Mr. DePine's case, there was mention or reference to an

19  inappropriate male or a male -- an adult making inappropriate

20  comments to him.  And not negating that experience for him --

21  and it can be very traumatizing -- it would not rise to the

22  level of meeting the definition of an adverse childhood

23  experience where it would have an impact on their psychosexual

24  development, because usually these things lead to the deviant

25  interest.

1   Q.   And before I ask you whether you formed any expert

2   conclusions or opinions as a result of that which you've

3   testified to here today, is there anything else that you have

4   done with respect to assessing Mr. DePine's risk that I failed

5   to ask you about?

6   A.   I don't think so.  I was just mentioning that whether you

7   looked at him as a statutory sex offender, which is my

8   professional opinion, I also included research on child

9   pornography offenders and solicitation offenders.  And whether

10  you use any one of those reference points, all three would

11  suggest or indicate very low risk.

12      For example, solicitation offenders, the most recent study

13  looking at recidivism with them was -- and I believe I have it

14  in the report, the citation -- I think it was point --  I can

15  tell you exactly -- 0.5 percent recidivism, which, again, was

16  very similar to -- and actually lower than the projected rate

17  based on the Static.

18      And for child pornography offenders, the largest recidivism

19  studies to date on child pornography offenders was conducted by

20  Goller in 2016, and it was inclusive of all child pornography

21  offenders.  I like the study because it would include people

22  who may be placed in that category or charged with a crime and

23  maybe the conduct doesn't exactly fit.

24      So, again, matching very closely to -- may or may not, but

25  matches more closely to the circumstances in this case.  And

1    they found that recidivism for that particular group -- and I

2    believe it was over 4500 child pornography offenders -- was

3    point -- let me look -- 0.2 percent at five years and 0.5 at

4    ten years post-release for community placement.

5    Q.   Based on your studies, your findings and conclusions, have

6    you found any evidence that Mr. DePine suffers from any mental

7    illness related to sexual deviance?

8    A.   No.

9    Q.   Based on the evidence that you have reviewed in this case,

10   the testing that you did, the studies that you reviewed, do you

11   have any evidence that Mr. DePine suffers from a mental illness

12   related to a criminal mentality disorder?

13   A.   No.

14   Q.   And same opinion with respect to the risk that Mr. DePine

15   poses to the public safety, do you have an opinion with respect

16   to what you believe Mr. DePine's risk is to the community as a

17   result of this particular offense?

18   A.   Yes.  I believe he's a low risk.

19   Q.   Do you have any other opinions or conclusions about which I

20   haven't asked you?

21   A.   No.

22        **MR. SCHAFFNIT:**  Your Honor, may I have just a moment?

23        **THE COURT:**  Yes.

24        **MR. SCHAFFNIT:**  Your Honor, that's all I have.  I

25   would tender the witness.

1        **THE COURT:**  Thank you.

2               Mr. Goldberg?

3        **MR. GOLDBERG:**  Not necessary, Your Honor.  Nothing

4    from the Government.

5        **THE COURT:**  Ma'am, you may step down.

6               *(Witness excused.)*

7               May she be excused?

8        **MR. SCHAFFNIT:**  I was about to ask that question.

9        **MR. GOLDBERG:**  Nothing from the Government, Your

10   Honor, truly.  Thank you.

11       **THE COURT:**  All right.  Thank you, ma'am.

12       **MR. SCHAFFNIT:**  Dr. Kline, you may be excused.

13       **THE COURT:**  Anything from the Government?

14       **MR. GOLDBERG:**  (Indicating negatively.)

15       **THE COURT:**  Then I'll hear argument.  Mr. McGee, we'll

16   start with you.

17       **MR. MCGEE:**  Thank you.  Your Honor, we have provided

18   you with a book that contains various documents that we intend

19   to reference.  I believe each of those is already in the record

20   of the Court, but I would want to make clear that they are

21   offered in evidence, and I just want to make sure they're in

22   the record.

23       **THE COURT:**  All right.  I believe they are all in the

24   record.

25       **MR. GOLDBERG:**  There's no objection, Your Honor, if

1  they're all in the record.

2        **THE COURT:**  This will be admitted as a Defendant's

3  Sentencing Exhibit 1, a composite exhibit of all of those

4  items.

5        **(Defendant's Exhibit 1 admitted into evidence.)**

6        **MR. MCGEE:**  Thank you.  I think that's a good idea to

7  have them all in one place.  They'll be the basis of the

8  argument in this case.

9        There's a couple of objections that we have to the

10  factual statements made in the PSR, not of great significance,

11  but I think worth mentioning.

12        There is a statement in the PSR that the purpose of

13  the boat ride was for him to spend time with the girl, and that

14  is incorrect.  The boat ride was offered to his friend, Dave

15  Butts, and their family, and it just happened that the girl was

16  going along.

17        If you read her journal, you'll see I think evidence

18  that in fact this was not something that he set up.  We object

19  to that.  And I don't think there's any evidence in the record

20  or that the Government has to say that he deliberately set up

21  that boat ride so he could spend time with the girl.

22        **THE COURT:**  Okay.

23        **MR. MCGEE:**  The second thing is they -- and I think

24  this is cleared up.  I talked to the probation officer.  They

25  said in the PSR that he had purchased a camera for her, the

1    camera that was used to take pictures.  That is, I think

2    everybody concedes now, incorrect.  It was -- he had provided

3    her with some money at times with which she bought things, but

4    not that camera.  The camera is one that she had and had had

5    for some time.  And I talked to the probation officer

6    beforehand, and I think he does not disagree with that.

7         **THE COURT:**  Well, that seems to be consistent with the

8    victim's statement to law enforcement.

9         **MR. MCGEE:**  I'm sorry?

10        **THE COURT:**  What you are representing to the Court

11   seems to be consistent with the victim's statement to law

12   enforcement.

13        **MR. MCGEE:**  Yes.

14        **THE COURT:**  Mr. Goldberg, let me just stop and ask

15   you, as to this specific objection, do you have anything you

16   want to add?

17        **MR. GOLDBERG:**  No, Your Honor.

18        **THE COURT:**  All right.  Then that will be sustained.

19        **MR. MCGEE:**  I note, too, that the Government has

20   submitted letters from a girl whose picture was found in

21   unallocated space on a computer that Mr. DePine owned.

22        First of all, I don't know how much the Court knows

23   about computers and what unallocated space is, but unallocated

24   space means that he can't get to that picture.  That picture

25   has been disposed of from the computer.  You cannot get to it

1    without forensic software that allows you to access it.

2         Because it is in unallocated space, the Government

3    cannot tell you when it went there, how it got there, who put

4    it there, or if anyone has ever looked at it, much less

5    Mr. DePine.  And that is a serious objection of the photograph.

6    And that is kiddy porn, and they seek to have some effect from

7    that.  But there is no evidence whatsoever that Mr. DePine ever

8    looked at it.  It is inconsistent with the kind of things that

9    Mr. DePine did look at.  It is not accessible to Mr. DePine.

10   They cannot tell you when that piece of -- those photographs

11   went into that space.

12        **THE COURT:**  That's not the only image that supports

13   Count Four, though, is it?

14        **MR. MCGEE:**  No.  But all the other images in Count

15   Four are the images of the girl in this case.  Right?  The only

16   images they have other than those are the girl in this case.

17   And I don't think -- he has not pled to that one, by the way.

18   We made that point at the plea.  He vehemently denies it and

19   even the cops admit that he has told the truth when he was

20   interviewed by them.  That is not something that they have any

21   evidence whatsoever that he's ever looked at, that he ordered,

22   that he wanted, and that he ever dealt with at all.  And it

23   would be completely unfair and inappropriate and incorrect to

24   use that in assessing a sentence in this case at all.

25        That is genuinely pedophile material.  You've heard an

1    expert tell you that he is not a pedophile.  How it got on the

2    computer, nobody knows.  The Government does not know.  We

3    don't know.  Mr. DePine --

4              **THE COURT:**  It was on his computer, though.

5              **MR. MCGEE:**  What's that?

6              **THE COURT:**  It's on his computer.

7              **MR. MCGEE:**  It's in unallocated space on his computer.

8              **THE COURT:**  Well, I don't know a lot about unallocated

9    space, to be quite honest with you.

10              **MR. MCGEE:**  That means that, at a minimum, it's been

11    deleted.

12              **THE COURT:**  But what if it was deleted by him?

13              **MR. MCGEE:**  He says he did not.  There's no evidence

14    that he did.

15              **THE COURT:**  But he used the computer.  He's the most

16    likely person to have deleted it.

17              **MR. MCGEE:**  But it's in -- he did use the computer,

18    but you don't know who else used the computer.

19              **THE COURT:**  No.  But I know he did.

20              **MR. MCGEE:**  I'm sorry?

21              **THE COURT:**  But I know he did.

22              **MR. MCGEE:**  You know that he used the computer.  You

23    don't know that he ever looked at that picture, ordered that

24    picture, knew anything about that picture.  There is no

25    evidence of that.

1          **THE COURT:**  All right.  I'll hear from Mr. Goldberg.

2          Let me hear from you, Mr. Goldberg, both on the

3    suggestion that the boat ride was intentionally set up by the

4    Defendant so that he could have access to the victim, and then

5    I'll hear from you on this issue of the Hawaiian Purple series

6    on unallocated computer space.

7          **MR. GOLDBERG:**  Certainly, Your Honor.

8          **THE COURT:**  And then I'll hear back from you again,

9    Mr. McGee.

10         **MR. MCGEE:**  Yes, ma'am.

11         **THE COURT:**  But let me try to keep track of this.

12         **MR. GOLDBERG:**  The Government doesn't have a dispute

13   about the boat ride factually.  And factually, as to

14   unallocated space, there is no disagreement.  It's just that

15   the Defense is wrong as a matter of law.

16         In their sentencing memorandum, which is Document 62,

17   for some reason the Defense only cites the Ninth and Tenth

18   Circuit, whereas there's binding Eleventh Circuit law directly

19   on point regarding unallocated space.

20         The Eleventh Circuit has consistently held that child

21   pornography in unallocated space, when combined with evidence

22   that a Defendant searched for or sought or produced access to

23   such materials, may be a basis for knowing receipt beyond a

24   reasonable doubt.  *United States vs. St. Gourdin*, 591 Fed.Appx.

25   893, that's the Eleventh Circuit 2015.

1          That's building upon the leading precedent, which is a

2     published case in the Eleventh Circuit, *United States vs.*

3     *Pruitt*, 638 F.3d 763, Eleventh Circuit in 2011.  See also

4     *United States vs. Shiver*, 305 Fed.Appx. 640, which is the

5     Eleventh Circuit in 2008.

6          So, in sum, we do not dispute an explanation of

7     unallocated space.  The day his computers were seized, he may

8     not have been able to access them.  But that doesn't mean at

9     some point he wasn't or that at some point he didn't possess

10    them, or at some point he didn't receive them, which the

11    binding law of this circuit, when coupled with other factors,

12    say, for instance browser history, websites visited, which are

13    in PSR paragraphs 35, 36, 37, or, hypothetically, say, for

14    example, he took pictures of a minor engaged in sex acts, which

15    is the entire PSR.

16         So when coupled with other factors, unallocated space

17    is a receipt or possessory offense beyond a reasonable doubt

18    under Eleventh Circuit law.  And here, the burden on the

19    Government would be just by a preponderance of the evidence.

20              **MR. MCGEE:**  May I respond, Your Honor.

21              **THE COURT:**  Yes.

22              **MR. MCGEE:**  All they have is that on a computer that

23    Mr. DePine had used that there was, in unallocated space which

24    he had no access to, a couple of photographs of pedophile

25    material.  They have no evidence that he ever accessed it.

1    They want you to sentence the man on the basis of -- with no

2    evidence at all that he ever accessed it, ever ordered it, even

3    knew it was there.  They don't know that.

4           **THE COURT:**  But, Mr. McGee, the standard here is

5    preponderance of the evidence.

6           **MR. MCGEE:**  That's correct.

7           **THE COURT:**  And I draw inferences from other facts

8    that are relevant.  And undisputedly, this was his computer, he

9    lived alone, he had a browsing history consistent with that

10   type of material.

11          **MR. MCGEE:**  I contest that.

12          **THE COURT:**  We know he took photographs of a minor.

13   Those facts lead me to conclude that he deleted those images

14   and they ended up in unallocated space.  I can't explain how it

15   ended up in unallocated space, but I can certainly tell you it

16   was on his computer or it would never have been in unallocated

17   space.  There's no evidence that anyone else ever had access to

18   that computer.

19          **MR. MCGEE:**  There's no evidence --

20          **THE COURT:**  Yeah, but the only evidence is that he had

21   access to that computer.

22          **MR. MCGEE:**  Well, the fact that there is evidence that

23   he had access to the computer is no evidence that no one else

24   had access to the computer.

25          **THE COURT:**  But I'm not going to assume that someone

1  else had access to the computer when there is nothing for me to

2  infer that from.

3        **MR. MCGEE:**  Let me talk about a couple of things.  The

4  browser history.  The browser history is like every

5  heterosexual male in America that looks at pornography on the

6  internet, which is about 90 percent of them.  And that browser

7  history -- and if you read Dr. Kline's report, she talks about

8  the use of the word "teen" and how that is in one of every

9  three pieces of pornography on the internet they use the word

10 "teen" and it does not mean that they are actually teens.  I

11 will guarantee you that there are males in this room who have

12 looked on pornography on the web that says "teen".

13        If you have cable television in this town -- and they

14 have an adult channel, okay.  I don't subscribe to the adult

15 channel, but you can look at the titles on the adult channel,

16 and about every third one on the adult channel on the cable

17 television in Pensacola, Florida, says "teen", "teen", and

18 "young people", and this sort of thing.

19        More importantly, that is not -- according to

20 Dr. Kline, that is not indicative of pedophilia.  That is not

21 indicative of an interest in that sort of thing.  That

22 photograph that they want that is in unallocated space is

23 inconsistent with anything in this case.  The pictures that he

24 has on his computer of the girl in this case were all sent to

25 him by that girl.

1              **THE COURT:**  Right.

2              **MR. MCGEE:**  Every single one of them were sent to him

3      by that girl.  The girl in those pictures did not send him

4      those photographs.

5              **THE COURT:**  You keep referring to one photograph in

6      unallocated space.

7              **MR. MCGEE:**  There's a series of them but it's the same

8      thing, it's the same girl in a couple of poses.

9              **THE COURT:**  Is it a couple?  It was more than two, I

10     believe.  Was it 16 maybe?

11             **MR. GOLDBERG:**  (Indicating affirmatively.)

12             **MR. MCGEE:**  I didn't think it was that many, but the

13     truth is I don't know the exact number.  I just remember --

14             **THE COURT:**  The PSR in paragraph 37a references 16

15     images.

16             **MR. MCGEE:**  It may be.  I'm not in a position to

17     contest that.  What I can tell you is he did not order those,

18     he did not know they were there.  They are inconsistent with

19     what other evidence you have in this case.

20             And Mr. Goldberg is correct that there are cases in

21     the Eleventh Circuit that say we're going to take into account

22     the photographs in the unallocated space.  But if you read

23     those cases, what they tell you is that's because there's a lot

24     of other evidence that says he's doing this on a regular basis,

25     that he is ordering pornography and deleting it and he's made

1    those admissions.  And in those cases they will consider what's

2    in the unallocated space.  None of that is present in this

3    case.

4         **THE COURT:**  I have not read these cases, so I will do

5    that momentarily before I pronounce my sentence.

6         **MR. MCGEE:**  What they say -- you have to look at the

7    factual situation.  There are cases in other circuits where

8    they clearly say the unallocated space cannot be charged.

9         **THE COURT:**  Right, I'm aware of those, you cited them.

10        **MR. MCGEE:**  Absolutely.

11        **THE COURT:**  But we're in the Eleventh Circuit.

12        **MR. MCGEE:**  There are some exceptions to that in this

13   circuit whereas you can tie them into the other evidence to

14   show that he actually -- and the key is you have to show that

15   he actually knew about what was in that unallocated space, that

16   he knew about that.  I cannot imagine trying to sentence

17   someone without evidence on the basis of something that you

18   don't know if he knew anything about it.

19        Now, I've got computers.  I've got computers at my

20   office.  I get -- and I know I'm not the only one.  Talk to

21   anybody.  You get things sent to you that you don't order.  I

22   remember when we -- I used to get regularly French pornography

23   sent to me on my computer which I would just instantly delete.

24        If you go into pornography, adult pornography on the

25   internet, they will send you things from time to time, okay.

1          **THE COURT:**  But this browsing history that's

2     referenced in the PSR and the facts in this case involving this

3     victim certainly do not suggest to me -- in fact they suggest

4     just the opposite -- that he was not aware of these images on

5     his computer.  It would suggest otherwise.

6          **MR. MCGEE:**  He was not aware of things that were in

7     unallocated space, and there's no evidence that he was.  The

8     browsing history is standard pornographic browsing history.

9          **THE COURT:**  It is not standard -- maybe child

10    pornographic browsing history.

11         **MR. MCGEE:**  I'm sorry?

12         **THE COURT:**  Standard child pornographic browsing

13    history?

14         **MR. MCGEE:**  No, no.  The only child pornography in

15    this case is of the 15-year-old girl that was sent to him by

16    the 15-year-old girl.  Nothing else is identified as child

17    pornography in this case, nothing.  None of the photographs.

18         They talk about teen -- about the looking for teen

19    pornography on the internet.  None of those are identified as

20    child pornography, not a single one.

21         And if you go -- if you are a heterosexual male and

22    you start looking at pornography on the internet -- and this is

23    -- I noticed their records go back to 2004 or '05 for this,

24    they're talking about a period of 15 years -- you're going to

25    find that much of it says "teen", "younger", that sort of

1    thing.  That's not indicative of what's actually on there.  It
2    is the way they sell pornography on the internet, it's the way
3    they get clicks.  And it is specifically, according to
4    Dr. Kline, not indicative of pedophilia.  Mr. DePine is not a
5    pedophile.  This is the outlier case.
6           The only photographs he has that he is aware of of
7    someone under the age of 18 are those of this girl.  And every
8    one of those photographs was sent to him by the girl.  That's
9    the only -- that's the only child pornography that he has.
10          Now, that does in fact bring him within the statute,
11   but it makes him very different than the typical case under the
12   statute.
13          **THE COURT:**  Like I say, I'll need to read the Eleventh
14   Circuit cases before I make my decision on this objection.  The
15   objection as to the language in the PSR regarding the boat ride
16   will be sustained.
17          **MR. GOLDBERG:**  Your Honor, if I can just make -- there
18   was a lot of discussion there that's not actually evidence, and
19   I just want to note something that is actually evidence, which
20   is Document 52, which is the factual basis for the plea which
21   the Defendant signed under oath.
22          Quote:  "The Defendant maintained an internet browser
23   history involving websites wherein the Defendant searched for
24   teens engaging in sexual acts with adults."
25          I just wanted to make sure the Court is aware that

1    that is a part of the record, that is actually evidence.

2        **MR. MCGEE:**  That's what all the internet porn says.

3    That's just going --

4        **THE COURT:**  So your position, Mr. McGee, is that this

5    browsing history --

6        **MR. MCGEE:**  Does not tie him to that -- to those

7    photographs --

8        **THE COURT:**  Excuse me.

9        **MR. MCGEE:**  I'm sorry.

10       **THE COURT:**  That the browsing history is related to

11   teens of what age?

12       **MR. MCGEE:**  Doesn't say.  It's not -- they're not

13   teens, actually.  It is a sales technique used by the people

14   selling pornography.  There's -- common sense tells you they're

15   not really minors.  They might be -- they might be young ladies

16   but they are not minors.  Because this is on the internet on a

17   regular basis and if they were minors -- if they were anything

18   but adults, these people would be prosecuted on a regular

19   basis.  And it is all over the internet.  It is on your cable

20   television at home.

21       The fact that he's looking at something that says

22   "teen sex" does not mean that he's a pedophile.  It doesn't

23   mean that it actually is a minor.  It is typically not.  It is

24   something they use to sell things.

25       And Dr. Kline's report will tell you heterosexual

1    males have a natural inclination to look for young women, okay.

2    They use that on the internet to sell this stuff.  But it's not

3    actually -- it's not actually minors in there.  And they went

4    through all of these and were unable to identify a single

5    minor.

6              I sat and talked to their computer guys and their

7    customs people or whatever they call them now, Homeland

8    Security, and they're not able to tell you that any of those,

9    other than the one in unallocated space, is a minor.

10             And what he's looking at is what 80 percent of

11   American men are looking at on the internet, because that's

12   what's there, it's there in great numbers.  All you've got to

13   do is push a button and it's there.

14             **THE COURT:**  Well, I don't know any of that.  I'm not

15   an American male --

16             **MR. MCGEE:**  I know.

17             **THE COURT:**  -- and I don't search the internet with

18   these search terms.

19             **MR. MCGEE:**  Yeah, but you can get -- just punch the

20   word "sex" --

21             **THE COURT:**  No, I'm not about to do that.

22             **MR. MCGEE:**  -- into your computer.  Well, it will be

23   shocking.  And when --

24             **THE COURT:**  But I do know what I see in this

25   courtroom, Mr. McGee, and I've seen more images than I care to

1   talk about.  But I've seen those images in relation to search

2   terms and browser history that's not all that different than

3   what I see in this case, and I've seen the images that come out

4   of that.

5           You're right, sometimes the pictures are -- it's hard

6   to tell.  Many times it's not hard to tell.

7           **MR. MCGEE:**  Well, they looked at a whole bunch of them

8   in this case and were unable to identify a single minor, okay?

9   That's not what he's looking -- and let me tell you this:

10  That's not all he's looking for.

11          What they've given you is the ones that have "teen" in

12  them.  Okay?  There's a thousand other searches in there for

13  some kind of pornography or the other.  Because the truth is

14  heterosexual males who live alone look at pornography on the

15  internet.  And all you've got there is, over a 12 or 15 year

16  period, at some point or the other, in a number of instances --

17  I think there's a couple dozen of them, I don't know exactly

18  how many, however many there are in the report, there are --

19  he's looked at pornography that had the word "teen" and some

20  suggestion of "teen" in it.  But that is what's on the

21  internet.  That's the common stuff.  That's what everybody is

22  looking at on the internet.

23          **THE COURT:**  So there were images on the computer of

24  individuals that it could not be determined that they were

25  minors?

1    **MR. MCGEE:** That's correct.

2    **MR. GOLDBERG:** Your Honor, I'm sorry. The Government

3  is going to at least have to make this record because there's

4  things said that are not in evidence.

5    **THE COURT:** I would appreciate you doing that.

6    **MR. GOLDBERG:** I'm going to move to admit -- it's

7  already in the record. This is Government's Exhibit 3G from

8  the detention hearing. These are a smattering of the 16 images

9  that were in the Defendant's possession.

10    May I approach the bench?

11    **MR. MCGEE:** And I object to him saying it's in his

12  possession. It is on the computer in unallocated space where

13  he can't access it, he can't get to it.

14    **MR. GOLDBERG:** That's fine, Your Honor.

15    **THE COURT:** But let me clarify something before you do

16  that, Mr. Goldberg. I understand there were 16 images of the

17  Hawaiian series located in unallocated space. What other

18  images were found on his computer?

19    **MR. GOLDBERG:** I have a sample here, Your Honor.

20    **THE COURT:** Oh, okay, that's what you're referring to,

21  all right.

22    **MR. GOLDBERG:** May I approach?

23    **THE COURT:** Yes.

24    **MR. GOLDBERG:** And I would just ask that it be under

25  seal.

1      **MR. MCGEE:**  May I have a copy?

2      **MR. GOLDBERG:**  I can't give you child pornography.

3  That's a crime.  But you've seen these before.

4      **MR. MCGEE:**  These are the ones we're talking about

5  that were in unallocated space?

6      **MR. GOLDBERG:**  Correct.

7      **THE COURT:**  So these are in unallocated space?

8      **MR. GOLDBERG:**  Correct, Your Honor.

9      **THE COURT:**  So what else was found on his computer,

10  what other images other than these that were in unallocated

11  space?

12      **MR. GOLDBERG:**  There's nothing else mentioned in the

13  PSR.  There's no other evidence.  It's S.B., the minor victim

14  that he produced the child pornography of, and then it's 16

15  images in unallocated space.

16      **THE COURT:**  Right.  I'm asking you if there were

17  images that were located on his computer that you were unable

18  to determine if they were a minor.  So were there other images

19  of pornography?

20      **MR. GOLDBERG:**  There were other images of pornography

21  of adult females that were in his house.  Those were admitted.

22      **THE COURT:**  I remember that.

23      **MR. GOLDBERG:**  That's it.  The Government is not

24  suggesting there's any other child pornography there.

25      **THE COURT:**  Or teens that might have been --

1          **MR. GOLDBERG:**  Correct.

2          **THE COURT:**  -- 16, 17, 18?

3          **MR. GOLDBERG:**  Correct.  The Government doesn't ask

4    this Court to make close calls, as you're aware.

5          **MR. MCGEE:**  So, Judge, what you've got is they looked

6    at his computer history for 15 years -- I think they began in

7    2004 -- and there is only that batch of pictures that are all

8    related that they find in this 15-year history.  Okay?  And

9    they're in unallocated space.

10          There is nothing else in there other than the girl's

11    pictures that she sent to him in this case.  That's all there

12    is.  Okay?

13          So the evidence is, he's got those girl's pictures,

14    and some time in the last 15 years somehow some genuine

15    pedophile pictures got on unallocated space.  They are

16    inconsistent with -- the only other minor pictures in this case

17    are the ones sent to him by the girl in this case.  That's all

18    there is.  That -- those are not his.  Those are not pictures

19    he ordered.  Those are not pictures he knows anything about

20    other than what the Government told us at the bond hearing, and

21    they didn't tell us then that it was in unallocated space.

22          **MR. GOLDBERG:**  Your Honor, just for purposes of the

23    record, because I do think it's important, obviously this is an

24    important issue for the Court to determine, but I do want the

25    record to reflect this will not in any way impact the

1    Sentencing Guidelines because his Guidelines are driven by

2    Chapter 4 instead of Chapter 2.

3            **THE COURT:**  I understand.  But this is an objection

4    that's been raised.  But let me refer to the indictment for a

5    minute, Mr. Goldberg.  The indictment, in terms of child

6    pornography, basically is Count Three and Four, receipt and

7    possession.  Possession is the charge at issue here in addition

8    to Count Two.

9            But for purposes of this discussion, Count Four, I

10   mean, your time frame is August 1st, 2018, to January 4th,

11   2019.  Mr. McGee is arguing to me that there's no way to know

12   when the 16 child pornography images were downloaded, I guess,

13   or deleted.

14           **MR. GOLDBERG:**  Yes, Your Honor, that's absolutely

15   correct.  And pursuant to Document 52, he pled guilty to

16   possessing images of the minor victim in this case.  So it is

17   not part of Count Four.  This is here for sentencing purposes

18   solely.

19           **THE COURT:**  It's not part of Count Four?

20           **MR. GOLDBERG:**  The Government is not asking the Court

21   to find anything other than those were located, as Your Honor

22   suggested, on his computer or electronic devices.  He's pled

23   guilty to producing child pornography.  In Document 52 he

24   stated under oath the Defendant maintained an internet browser

25   history involving websites wherein the Defendant searched for

1   teens engaging in sexual acts with adults.  Those are the

2   facts.  The Government doesn't have anything else and is not

3   asserting anything else.  That's all for the Court's

4   consideration based on Eleventh Circuit law.

5          **MR. MCGEE:**  It would be wrong, Judge, to sentence him

6   on the basis of that.  And while it's not a part of the

7   calculation, it is a serious matter for Mr. DePine and I think

8   for this Court, because you have some judgments to make in this

9   case, and I am confident that, if you thought he was a genuine

10  pedophile, that those judgments would be different than we

11  would like.

12          I do not believe the evidence suggests that he is a

13  genuine pedophile.  I do not believe that the evidence suggests

14  that he had any access to --

15          **THE COURT:**  The gravamen of the sentencing hearing in

16  this case is that that relates to the victim here.

17          **MR. MCGEE:**  Okay.  Let me go on to the heart of the

18  argument.  As you know very well that Mr. DePine has

19  acknowledged his guilt in this case.

20          **THE COURT:**  I do.

21          **MR. MCGEE:**  However, in this case the Government seeks

22  to sentence -- give him -- to impose -- to ask the Court to

23  impose a sentence that constitutes basically life in prison for

24  Mr. DePine, for a man that I think the evidence is very clear

25  is not a risk to this community or to society.

1            Dr. Kline was very clear on the risk assessment in

2    this case for a man who is not a pedophile.  She has done the

3    tests, and he is not a pedophile.  And for a man that got into

4    this case because of very unusual circumstances.  This is not

5    the usual pornography case.

6            **THE COURT:**  His Guideline range is not driven at

7    all -- because he's Criminal History Category I, it's not

8    driven by a perception of risk in the future.

9            **MR. MCGEE:**  No.  But I --

10           **THE COURT:**  It's driven by what happened in this case.

11           **MR. MCGEE:**  I understand that.  But it -- the Court

12   has some decisions to make with regard to how long a sentence

13   to impose.  And it occurs to us that risk of him -- that risk

14   to the community, that risk that he is genuinely a pedophile,

15   that he is someone who would be a danger to the community is a

16   factor that the Court will likely consider.

17           And I think it important to establish that he is not a

18   risk.  And that's part of the reason for Dr. Kline's testimony

19   is that he poses no greater risk to the community than does the

20   average individual.

21           **THE COURT:**  But she didn't testify that he doesn't

22   pose a risk, per se, to 15 year olds.  She said he doesn't pose

23   a risk as a pedophile involving prepubescent minors.

24           **MR. MCGEE:**  She did, she said he's a pedophile --

25           **THE COURT:**  He's not a pedophile, that's what she

said.  She said he's not a pedophile.

**MR. MCGEE:**  Yeah, he's not a pedophile, and that future criminal conduct by a man of his age in these circumstances is highly unlikely.  And she gave some numbers on that, and I can't quote the numbers, but the numbers were very low.  He is not likely to reoffend.

And if you look at the circumstances in this case, they are unusual.

**THE COURT:**  I don't disagree with you, Mr. McGee.  I'll hear from Mr. Goldberg.  But without hearing from him yet, I don't disagree with you.  Particularly we know, at a minimum, he's going to receive a mandatory sentence of 15 years at a minimum.  And I don't disagree with you, with that sentence, by the time he gets out, I don't perceive him as a risk.

**MR. MCGEE:**  I'm sorry?

**THE COURT:**  I don't perceive him as a -- certainly not a significant risk.  I'm never going to say that someone in this situation is no risk at all.  But her opinion was he's a low risk, and I don't have any reason to dispute that when he gets out, mainly given the age.

**MR. MCGEE:**  Let me talk about the circumstances of this case, if I can, Your Honor, because they are, I think, indeed unusual.  The girl in this case -- the relationship in this case was begun by the girl.  I don't know if you've read her journal but --

1    **THE COURT:**  I read her journal.  And just for the

2    record, I read her journal very carefully, her entries, and I

3    read her statement to law enforcement very carefully.

4            **MR. MCGEE:**  In the journal, she -- and this is her own

5    words she put on -- nobody is asking her to do it.  This is in

6    her journal found in her bedroom at her house.  She

7    acknowledges that she got fascinated, infatuated with

8    Mr. DePine.  She acknowledges that she had sexual fantasies

9    about Mr. DePine.  She acknowledges that she decided to act on

10   those sexual fantasies to, in her words, make her move on

11   Mr. DePine.  That is what is reflected.

12           And then she -- in her own journal.  She then

13   describes how, when they went on the boat, how she makes her

14   move, how she puts her hand on his leg, how she later calls

15   him, after they get home, calls him and invites him over.  She

16   herself initiated this relationship.  And the journal is Tab 9

17   in the exhibit.

18           Tab 10 has got her interview by the police.  In her

19   interview with the police, she says -- and that's -- this is at

20   Tab 10.  She says at page 1 that she initiated it.  She says,

21   "I just initiated it."  That's her language.  She started this

22   relationship based on the fantasies that she's been having.

23           She says at page 7 that what happened was her fault.

24   That's her language.  She says, "It's all my fault."  That's a

25   quote.  She says that at a point in the relationship Mr. DePine

1    wanted to break off the relationship with her and that she did

2    not want it to end, that she wanted to continue the

3    relationship even though he wanted to end it.

4        And, look, he recognizes that what he did was wrong,

5    absolutely.  He should not have had a relationship with a

6    15-year-old girl.  But at the same time, he is not some

7    predator out there prowling the streets looking for children.

8    And we'll talk about this.  He is a very, very different kind

9    of defendant in this case.

10        She says that he never forced her to do anything or

11    asked her to do anything.  That's at page 2 and page 8.  She

12    says -- this is the victim in the case.  She says she doesn't

13    want any harm to come to him.  She says that at page 2.

14        Mr. DePine himself is not the typical pornographer.

15    Every picture at issue in this case was sent to him by the

16    girl.  And there's no solicitation in the record.  She sends

17    him the picture.  So the victim -- now, I understand the

18    pornography laws are to protect the victims.  They don't want a

19    bunch of people looking at the pornography and causing further

20    injury to the child in the photograph.

21        But in this case, she sends her own pictures to him.

22    And the ones he takes with the camera are not the first ones.

23    Okay?  And we'll talk about that.  But she has sent him videos

24    of herself masturbating in her bedroom.  That's unsolicited,

25    she sent to him.

1    The pictures with the camera, okay, she brings the

2    camera over.  It is her camera to his house.  She asks him to

3    take pictures of her.  She wanted -- she says that she wanted

4    to do pictures like the poses in the magazines, the sports --

5    it's a Sports Illustrated bathing suit issue, and she wanted to

6    do poses like that, and so she asked him to take pictures.  He

7    takes them.

8    He then gives her the camera -- and this is all in the

9    police interview -- gives her the camera, she goes home with

10   the camera and the pictures in the camera and later sends the

11   pictures to him.  This is the victim sends him the pictures

12   that they want to send him to prison for the rest of his life

13   for.

14   The videos.  He never transmitted a single photo to

15   anyone.  He's not a pornographer.  He's not one of these guys

16   that flies to Thailand, hires children to do sex acts, and then

17   sells it on the internet.  The only photographs he's got are

18   the ones that are girl, who wanted to seduce him, who was

19   sending him her pictures, sent to him.  That's what this case

20   is about.

21   The girl, briefly.  Sexually motivated, driven,

22   amorous.  You know, it's hard to get into the head of a

23   15-year-old girl, but she acknowledges sexual fantasies about

24   him before anything happens, she acknowledges that she's going

25   to make a move on him, all right, and she does, and then she

1  talks about how she did it.

2      She planned it, she initiated it.  As a part of this,

3  she sends him lurid pictures -- now, she's trying to seduce

4  him -- she's sending him lurid pictures of herself that she

5  takes in her bedroom.  That's her doing it, the victim.  She

6  produced and distributed pictures of herself and she sent them

7  to DePine.

8      And I've talked about the one time he takes pictures

9  of her but gives her the camera and then she sends the pictures

10  to him.

11      Mr. DePine does not fit the mold of the pedophile or

12  the pornographer.  He is not a pedophile.  And you've heard

13  Dr. Kline.

14      He's 63 years old.  He has lived an exemplary life.

15  He has worked in a stable position for 25 years at a high

16  level.  He's a top -- he doesn't do these kind of computers,

17  not the laptops.  But he does the big stuff that the banks use

18  and they use it internationally.  Okay?  He had a very good

19  job.  He was at it for 25 years.

20      He has never, ever had a legal entanglement.  If you

21  look at the letters, he gives back to his community.  He served

22  in the emergency rescue service.  He has saved peoples' lives.

23  He was in the emergency rescue service for years, which is

24  entirely voluntarily.  Never had an encounter with law

25  enforcement.  He is also a very vulnerable man when this girl

1   decides that she wants to have an affair with him.

2          If you look at Tab 12, it is a psychological report

3   that was done on August 29th of 2018.  He is -- and this tells

4   you a lot.  He wants to have bariatric surgery because he's got

5   a serious weight problem.  And to do that, you have to have a

6   psychological profile done.  And this is the psychological

7   profile, and it tells you a lot about him.

8          At the time this girl sets out to seduce him, he is

9   depressed.  It says so in the record.  Dr. Kline talked about

10  it.  He is suffering from depression.  He is in ill health.

11  He's a diabetic.  He is obese.  I mean, obviously -- and he's

12  actually lost weight at the jail.  But he's obese.  He has -- I

13  mean, he's concerned about himself.  He wants the bariatric

14  surgery.  He wants to get the weight off.

15         He has been living alone for decades.  He was married,

16  divorced in the '90s, but he is living alone.  He has no

17  romantic entanglements.  That is part of the report, okay, and

18  August 29th he has no romantic entanglements at all.  He has

19  never had -- since his marriage he's never had a significant

20  that is a long term relationship with a woman, something that

21  has frustrated him.

22         So here is this 62-year-old man in poor health,

23  depressed, living alone.  And at page 2, they talk about him as

24  being socially isolated.  The girl that -- the man that she

25  decides to seduce is depressed, obese, socially isolated,

1  living alone, and apparently having a difficult time forming a

2  long term relationship with a woman since his divorce.

3         He is -- look, and you've got to be careful when you

4  start talking about the victim as, you know, something other

5  than a victim.  But he is vulnerable.  He is the one who gets

6  seduced in this case.  He's the one that wants to get out of

7  the relationship -- and this is her statement to the police --

8  and she's the one that doesn't want to get out of the

9  relationship.

10        We've talked about risk.  He poses no risk.

11        Look, what he did might not be right, I understand

12 that.  But it is certainly, in these circumstances,

13 understandable.  And all of that is substantiated in the

14 record.  This is not something some lawyer made up.  It's in

15 the record.

16        You have letters that we received yesterday afternoon,

17 the afternoon before this hearing, from the dad and the

18 granddad.  And they're -- look, they're understandably angry

19 letters.  I appreciate that.  I don't begrudge them the angry

20 letter.

21        But the fact that they are angry letters should be

22 taken into account.  Because when you're angry, and

23 particularly in this case, they've either chosen to ignore the

24 evidence in the case -- when they talk about their innocent

25 girl, all right, they've either chosen to ignore it or they

don't know what the evidence in this case is.  Because the facts are that this is a girl who had a strong sexual drive, who had sexual fantasies about Mr. DePine before he knew anything about it.

Her grandmother -- and this is on Tab 10, page 9 and 10 -- her grandmother had been buying her sex toys.  Okay? They found -- the police found them in her bedroom and asked her about them, and she said her grandmother had bought her sex toys.

Now, this is a girl that is very different than what you typically think of in these cases.  She is not so much the victim.  Okay?  Every picture here is done at her request. Even the ones he takes are at her request.

The videos of herself engaging in sex acts she does herself, not him.  She acknowledges to the police that what happened in this case is her fault.  That's her words, "It's all my fault," that she initiated it, that she wasn't forced to do anything.

You've then got Kline's report which says he's not a predator and he poses no more risk than anyone else.

Look, they want to sentence this man to prison for the rest of his life, because 15 years to a man who is 63 years old and a diabetic, he will not live to 78.  That ain't going to happen.  All right?  And that's the mandatory minimum in this case.  And they have chosen to invoke the mandatory minimum and

1    deprive this Court of the discretion to sentence as you might

2    think appropriate in a case of this type.  You don't have as

3    much discretion because they have used the mandatory minimums.

4           And the mandatory minimums -- personal view -- they've

5    caused nothing but problems in this country for a lot of

6    different reasons.  They are causing problems in this case.

7    The crime of child pornography at its heart, what they're

8    really out to get is a terrible thing.  Those guys that go out

9    there and put sex acts with children and sell it on the

10   internet, they ought to go to prison for the rest of their

11   life.

12          But the problem is the statute has draconian

13   penalties, extraordinary penalties.  And the statue is so

14   broadly worded that it picks up guys like Mr. DePine who

15   basically acted like an old fool, okay, who was manipulated by

16   a pretty young girl.

17          And again, he's never said that what he did was right.

18   It wasn't.  He knows that.  But it is certainly not something

19   that a man ought to spend the rest of his life in prison for.

20   They've taken his house, they're taking his car.  I mean, this

21   is scorched earth.  It's not right.

22          There's a case in the Second Circuit that we quoted,

23   it's *Sawyer*.  And it's not significantly different than this

24   case.  The Second Circuit Court of Appeal was reviewing a

25   25-year mandatory sentence in a child porn case.  And a guy had

1    -- that one involved young children.  But he had just taken the

2    pictures and had not distributed them or anything like that.

3    And the Second Circuit Court of Appeal described the sentence

4    in that case of 25 years without parole as barbaric but not

5    unusual.

6          When one of the highest courts in this country says

7    that we are routinely imposing barbaric sentences, people ought

8    to stop and listen.  This is such a case.

9          The Government seeks a sentence that is 24 years and 4

10   months.  The sentence in *Sawyer* described as barbaric was 25.

11   We've gone overboard.

12         **THE COURT:**  Mr. McGee, do you know what -- and this

13   may not be a fair question, but do you know what type of

14   sentence, even if it's just a statutory, say, the maximum under

15   a state statute, that he could have been prosecuted under

16   for --

17         **MR. MCGEE:**  He would have been prosecuted for

18   statutory rape, and it would have been substantially less than

19   this.  And I can't tell you exactly what it would be, but it

20   would have been substantially less than this.  And the most

21   important --

22         **THE COURT:**  Statutory rape with no intercourse?

23         **MR. MCGEE:**  I'm sorry?

24         **THE COURT:**  Statutory rape with no intercourse.

25         **MR. MCGEE:**  Well, I think they define sexual

1   activity --

2         **THE COURT:** I don't know the statute. Does it

3   include --

4         **MR. MCGEE:** It's much broader -- it's much broader

5   than that. But here is the difference in state court: It

6   wouldn't be a mandatory minimum. The judge would listen to the

7   evidence and decide what justice demanded. You have been

8   deprived of that power. And that is wrong.

9         I know what the law says. I've read the Eleventh

10   Circuit case law. I've read the Supreme Court cases. But it

11   is wrong.

12         In *Miller v. Alabama*, the Supreme Court talks -- and

13   this is a significant change. Not a lot of people have read it

14   and understood that the Supreme Court was really changing, but

15   they were looking at mandatory minimums in juvenile cases. But

16   what they said is what the Court looks to to determine -- they

17   said cases must be -- graduated sentences must be graduated and

18   proportional to the offender. And to determine if they were

19   graduated and proportional, they looked to the evolving

20   standards of decency that mark the progress of a maturing

21   society. I think those are significant words.

22         I think what the Government seeks in this case does

23   not meet that standard.

24         I know the problems. I know the issues. I've read

25   the law. But what they want is wrong.

1    **THE COURT:**  All right.

2    **MR. MCGEE:**  I would like to introduce to you -- we've

3    got people here to speak on behalf of him, but you've seen the

4    letters.  I would like to introduce his family to you.  His

5    mother is here, Ms. McGowan.  His sister -- please stand --

6    she's here to support him, his sister Brenda, his brother Joe,

7    his lifelong friend Michael Grimsley down at the end.  They're

8    all here.  They know him, they love him.

9    **THE COURT:**  Thank you.

10   **MR. MCGEE:**  Thank you.

11   **THE COURT:**  Mr. DePine, is there anything you would

12   like to say today?  And you're fine where you are.

13   He's fine where he is.

14   **MR. MCGEE:**  He would like to address the Court, Your

15   Honor.

16   **THE COURT:**  That's fine.  It's okay for you to stay

17   where you are.  I just need you to move that microphone down

18   closer to you so I can hear you.  Thank you.  And I can see you

19   fine.

20   **THE DEFENDANT:**  Can you hear me okay?

21   **THE COURT:**  Yes.

22   **THE DEFENDANT:**  Yes, Your Honor, I actually do have

23   quite a lot to say.  How much time do I have?

24   **THE COURT:**  Well, I'm not accustomed to putting

25   defendants on a time clock, but there will be a point at which

1    I will ask you to wrap it up.

2         **THE DEFENDANT:**  Okay.  Well, if I get too long-winded,

3    just give me a hi sign or something.

4         **THE COURT:**  Okay.

5         **THE DEFENDANT:**  Okay.  Um, I'm kind of nervous, so

6    I'll try to get through this.

7         First and foremost, I want to offer an apology for my

8    actions that is the reason for us being here today.

9         At the time of my arrest, the detectives that were

10   leading the case, they took me into the conference room at my

11   office for an interview.  They read me my rights and then asked

12   me if I wanted to waive those rights and answer their

13   questions.  I told them I had every intention of cooperating

14   fully, and so I answered all their questions forthright and

15   truthfully.

16        They asked me to provide the pass codes to my

17   electronic devices, my iPhone and my computers at home, which I

18   did.  Then they presented the pictures in question that I took

19   with her camera at my house, and they asked me to identify them

20   and, in doing so, initial the top of each page.

21        At the end of the interview, they thanked me for my

22   cooperation and honesty, and they said that my cooperation

23   would go a long way to helping my case down the road.

24        I don't know if that -- that remains to be seen.  I

25   guess we'll see in a little while here.

1    But, as Mr. McGee has argued, this relationship began

2    when -- when she developed an infatuation with me and started

3    seducing me.  And, to be perfectly honest, I've never had a

4    girl of any age ever shower me with so much attention and

5    affection.  And in the state of mind that I was in, being so

6    vulnerable and being lonely and being in a depressed state of

7    mind, I guess I was just very susceptible to the advances and I

8    couldn't find a way to say no.  I was just too weak.  And it

9    led me to make some very stupid and very foolish decisions

10    which I'm going to regret the rest of my life.

11    So, yes, the pictures that I took at my house were

12    with her camera.  It wasn't purchased by me as it was suggested

13    in the PSR.  It was a camera that she owned for a long time

14    before we got to know each other, and it was a big, nice

15    camera, like a Canon or a Nikon, that had all these buttons and

16    dials and knobs.  She had to show me how to use it.

17    But to tell you the truth, when I took those pictures,

18    I didn't even think that I was breaking the law.  In my view,

19    we were just a couple of kids having fun.  Now, I know I'm not

20    a kid, obviously.  I'm just saying that's the way it felt.  And

21    she sent the pictures back to me.  My big mistake was saving

22    them on my computer.

23    But, now, I don't mean to suggest even for a minute

24    that any of this is her fault.  I know she said that in her

25    police interview.  But I know that I'm supposed to be the

responsible adult, and I should have known better, and I should have found a way to say no. But I just -- she came along at -- she came along at a time in my life when I was so lonely, and I just, you know -- I never forced her to do anything. Mr. McGee was right about that. I never hurt her, never did anything against her will. Everything was completely consensual.

I know that being a minor, her consent doesn't mean that much. But my point is I never forced her to do anything she didn't want to do. And so, after my arrest and first court appearance, we obtained Mr. McGee's law firm, and I started hearing all these new terms I never heard before like Federal Sentencing Guidelines and mandatory minimums and asset forfeiture.

I just -- I didn't know what was going on. And he began to explain all this to me, and I started to realize what a mess I had got myself into. I became aware that these mandatory minimums are something that you have to enforce and it didn't seem like it gave a lot of precedent to the individual details of the case.

All I know is -- see, I don't have much to compare this to because I've never been in the criminal justice system before. But I know that when -- since I've been housed at the jail, I've had a chance to talk to a lot of inmates out there, literally hundreds of them. And I do mean every single inmate I've talked to out there is a repeat offender of some kind,

sometimes three or four times in the system.  And all these
guys, you know, they talk about their sentences and their
crimes, and in many cases it seems to me their crimes are worse
than mine yet they talk about their sentences in terms of
months, not years.  And I'm thinking, my goodness, am I really
that bad a guy?

I don't know.  I just -- I'm just wondering why -- you
know, these guys, a lot of them, they talk about being out on
probation or getting probation, and I'm wondering why that
option was never offered to me.  I mean, it seems like, if
anybody deserves a second chance, it should be me, because I've
always had a clean record.

And then we talked about the forfeiture of my house.
I mean, my goodness, I've got over $500,000 of equity in that
house representing my lifetime of hard work, and now it's just
gone in a flash.  I mean, I had no idea that there was any such
law that would take a person's house away like that.  I would
venture to guess that less than five percent of the population
would be aware of this law, and that five percent would
probably be like people in the legal community, the lawyers and
judges and paralegals and such.

But, you know, I guess -- I keep thinking of this
analogy:  Let's say you have two guys that commit identically
the same crime and up to that point had clean criminal records.
You've got one guy that, although he's been criminal free, has

never really amounted to much. He's kind of a bum and he's
never been able to buy a house, he lives in an apartment.
Well, you can't take his house, he doesn't have one. The other
guy is me. I've amassed this -- through a lifetime of hard
work, I have this house and got it completely furnished. And
it seems to me there's something fundamentally wrong with a
system that can punish someone extra harsh because of their
success. And that's exactly what's happening to me here. The
same thing with the car.

But anyway -- excuse me, I'm just trying to compose
myself here.

Okay.

*[Conference between the Defendant and Mr. McGee.]*

I'm getting coaching over here.

I feel like I've always been a very stable member of
the community, and I've always had very stable employment. I
was only a few months shy of my 25-year anniversary with Navy
Federal, and it was a high tech job with a lot of
responsibilities.

Navy Federal's computers support a worldwide company,
and we have offices all over the world. So our computers have
to be up and available 24/7, 365, and have to be very highly
available. So there was a lot of -- a lot of pressure and
responsibility came with the job. During my tenure there, I
had several promotions and salary increases, eventually got my

1    figure over -- my income over six figures.

2          People could always depend on me.  And during my time

3    there, we -- I actually took -- we had three interns that

4    joined our staff fresh out of college, and these interns had

5    absolutely no prior experience on an IBM mainframe computer.  I

6    took them under my wing and tutored them.  And based on my

7    guidance and training, they've received several promotions, and

8    I regard their success as one of my proudest achievements

9    there.

10          As far as contributions to society, I used to be a

11   member of the Sterling Volunteer Rescue Squad in Sterling,

12   Virginia.  I ran 13 years of active duty.  I achieved lifetime

13   membership.  One year I was voted distinguished member of the

14   year.  And our squad provided mutual aid to the Pentagon during

15   9/11.

16          Other volunteer activities:  Oftentimes during heavy

17   snow storms in the northern Virginia area I'd hear the call on

18   the radio that they needed people with four wheel drive

19   vehicles to drive doctors and nurses to and from the hospital,

20   so I volunteered to do that.

21          I can think of several acts of being a good samaritan.

22   As you've probably heard, I have a very avid hobby of being a

23   boater.  And several times out on the water -- I can think of

24   at least five different occasions where I was able to tow in

25   boaters that were out there stranded or broken down.  I think

1   of the time when I rescued two kayakers on the Potomac River

2   who had become tired and couldn't paddle home because the

3   current had overtaken them, and I pulled them on board, got

4   their kayaks on board, and I drove them home and got them home

5   safe.

6          There was another time where we were out for a boat

7   ride and found a girl out there that was lost on a rented jet

8   ski.  She had lost her way.  And I asked her where she rented

9   the jet ski from, and I said, I know where that is, and I led

10  her back to the port.  And as we were pulling in, the rescue

11  squad was there getting ready to send out a search party, and

12  when they saw us pull in, they were very relieved that they

13  didn't have to go out and search for her, that she was safe.

14          *[Conference between the Defendant and Mr. McGee.]*

15          Okay.  I'm told I'm being given the sign to wrap it up

16  here.

17          So until this incident, yes, I had always been a law

18  abiding citizen, and my spotless criminal record is proof of

19  that.  I've always paid my taxes on time, my creditors, always

20  paid my utility bills, paid the mortgage each month on time and

21  would also send in additional principal to drive the principal

22  down, and that's why the equity in the house is so high.  And

23  that allowed me to achieve a very excellent credit rating.

24          So this really was an isolated one time incident with

25  this young lady.  And I'm hoping that there's compassion and

1    understanding from the Court recognizing my impulse and my

2    frailties of character.  I'm trying to own up to my

3    responsibilities here, but I just want to be treated fairly,

4    you know.

5            I mean, the -- it just occurs to me that, you know,

6    the sentence that I'm facing here, my gosh, that's -- there's

7    guys in prison right now doing time for second degree murder

8    that's probably less than half of what I'm facing.  I mean, I

9    never killed anybody.  I never even hurt anybody.  I've never

10   hurt anybody in my whole entire life in a malicious way.  I

11   don't know.  I just want to be treated fair.

12           I know I'm getting kind of long-winded, but -- yeah, I

13   just want to address -- there was a big discussion about these

14   pictures on unallocated space.  Truthfully, Your Honor, I have

15   no idea where those pictures came from.  All I can say is that

16   my computer was used by other roommates that I had living with

17   me at the time.  And I don't know if they took those --

18   downloaded those pictures.  I can't account for where they came

19   from.  I can tell you honestly they're not mine.  I have no

20   idea where they came from.

21           As far as the browser history, a lot of times -- I

22   mean, they were telling me that I was doing searches for

23   "teen."  I think a lot of times when you click on a link it

24   will build that URL into your browser history and they give the

25   illusion that I was doing searches, but it was not doing

1    searches.  But anyway, that's -- I just wanted to clarify that.

2          The last thing -- I'll just take two more minutes

3    because this is important.  I want to extend a sincere apology

4    to the family, in particular Mr. Dave Butts.

5          Dave and I met each other when Navy Federal relocated

6    me here from northern Virginia about five years ago.  We both

7    worked on the same computer system, so we sat in close

8    proximity to each other.  And even though I had been on the job

9    for about 20 years at that point, I saw that his technical

10   skills and knowledge was superior to mine, and he shared his

11   knowledge very openly and I learned a lot from him.

12         So it didn't take us long to become good friends, and

13   we started doing things outside work.  They would have me over

14   to their house on the weekends to watch football, cookouts and

15   barbecues.  I used to take his family out on several excursions

16   on my boat.  We went on several motorcycle rides together.

17         But I think the one aspect of our relationship that

18   speaks volumes is, whenever they would go out of town on

19   vacation and they wanted someone to watch their dogs -- they

20   preferred to have the dogs stay at home because the dogs were

21   more comfortable in their home environment, so they would ask

22   me to stay at their house, sleep in their bed.  I think that

23   says a lot, how much the high level of trust they had in me.

24         And I realize that I violated that bond of trust.  And

25   that's something that I'm going to regret the rest of my life.

1       So, Dave, I just want you to know that I am truly

2   sorry, and I'm going to miss having you as a friend.

3       And so, even though he doesn't regard me as a friend

4   anymore and I know this caused me to lose one of the best

5   friends I ever had, I hope that in some way he can find a spot

6   in his heart to forgive me some day.

7       Thank you, Your Honor.  And thank you for giving me

8   the opportunity to speak.

9       **THE COURT:**  All right.  Thank you.

10      **MR. MCGEE:**  We have nothing further, Your Honor.

11      **THE COURT:**  Mr. Goldberg?

12      **MR. GOLDBERG:**  That is exactly why this case is

13  different than others.  The Defense and I agree about that,

14  this case is different.

15      The Defense's argument essentially is that these

16  sentences are harsh and draconian, the victim is a seductress,

17  and the Defendant is an unhealthily old man who is not a

18  pedophile.  That's the defense.

19      Let's walk through a little bit what the actual

20  evidence was in this case before us.

21      Document 61 is the Presentence Investigation Report.

22  Paragraph 20 on page five for when the Defendant just says, "I

23  didn't know what I was doing was wrong, I didn't know it was a

24  crime, I didn't know I could lose my house."  The top of page

25  five, the message he sent on October 8th, 2018, to a minor

female, "You must know that what we've been doing is illegal,
right?" So he knew.

PSR paragraph 21, bottom of that same page. He's
messaging a minor female a month later about the taste of her
vagina. She's 15 years old.

PSR paragraph 22 -- and this one is very important --
on page 6, the Defense talks a lot about how she was the
aggressor, she was the seductress. On November 15th, 2018,
when the Defendant asked if he should bring a condom to the
next time they see each other, the minor female responds, "No
penetration." It's the Defendant that says, "Oh, really? I
promise I'll be as gentle as I can and use lots of KY so it
won't hurt you." That's the Defendant who wants vaginal
penetration, not the minor.

PSR paragraph 31, if we move forward chronologically,
on page 8. The Defendant, under the cover of darkness, is
surreptitiously picking the minor female up while Mr. Butts,
the grandfather who is in the courtroom here today, is sleeping
in his bed just down the hallway.

PSR paragraph 33, particularly at the top of page 9.
Oh, yes, we hear over and over and over again how the Defendant
just received these unsolicited images. But in that paragraph,
he edited them. There's postproduction work. He zoomed in on
her vagina, her genitals. He says, "Oh, I just shouldn't have
saved them." He did more than just save them. He edited those

1  pictures so he would have a closeup of a 15-year-old's vagina.

2      PSR paragraphs 35, 36, 37, the websites.  Particularly

3  just look at 35, on the Defendant's desktop computer the

4  following websites were bookmarked.  That's not browser

5  history.  That's bookmarked.  Like Your Honor may bookmark the

6  Eleventh Circuit Court of Appeals, these are bookmarks:

7      Quote, "Pink Teen Pussy, Free Teen Picks, and Teen

8  Movies."  "Young Porn and Teen Sex at YoungZilla."

9      On 37 "Sweet Teen Blonde Seduced and Fucked by Her

10  Friend's Dad."

11      Well, this is the grandfather.  His best friend is the

12  grandfather.

13      PSR paragraph 43, as we continue chronologically, at

14  least nine different occasions of sexual encounters.  This

15  isn't a one-off.  This isn't as bank robbery in one day.  This

16  is a multi-month crime against a child.

17      **THE COURT:**  Was there any evidence of penetration?

18      **MR. GOLDBERG:**  There was oral sex and digital

19  penetration.

20      **THE COURT:**  I'm sorry.  I meant intercourse.

21      **MR. GOLDBERG:**  There was not penis to vaginal

22  penetration that the Government has evidence of, but nine

23  separate instances of either oral sex or digital penetration.

24      But the Defendant blames the minor.  That's his

25  excuse, she's the seductress.  He's a 62-year-old man and she's

1  15 years old.

2  So what I ask the Court to consider is this quote:

3  "The determination and deceit involved in the commission of

4  these offenses cannot be overstated.  The minor female victim's

5  grandfather considered DePine to be a close and trusted friend

6  and thus routinely invited DePine into the family home.

7  Nevertheless, DePine maintained an illicit sexual relationship

8  with the minor victim for months, her grandparents none the

9  wiser.  There were surreptitious visits in the middle of night,

10  sometimes at DePine's house and sometimes in the victim's

11  bedroom as her grandparents slept just down the hall.

12  Compounding these concerns is evidence of the minor female's

13  apparent infatuation with DePine.  The law demands that a

14  62-year-old have the maturity and self-control to say no to a

15  willing or even solicitous 15-year-old.  The record in this

16  case clearly and convincingly demonstrates that DePine lacks

17  both."

18  That quotes Your Honor.  That's Document 42 detaining

19  the Defendant.  He couldn't stop himself.  She was 15.

20  Teenagers are immature and they are curious and

21  62-year-olds have to know better.  I'm struck in this case why

22  it seems okay for when we talk about 15-year-old boys being

23  sexualized and curious why boys are healthy but girls are a

24  seductress, or even worse, because we know what that's code for

25  in this case.

1       So the Defense argues, well, he's sixty-something

2  years old, he should receive a sentence reduction based on his

3  health.

4       Well, he's healthy enough to have been climbing into

5  her bedroom window under the cover of darkness.  He was healthy

6  enough for actual sex acts with a minor over many months.  He

7  was healthy enough to ask her for actual vaginal penetration,

8  even though she denied it.

9       And what I find telling in the Defendant's sentencing

10  memorandum, which is Document 62, is how the victim's

11  statements -- the victim, this is the minor -- the victim's

12  statements are cropped.

13       If you look at page 12 --

14       Madam Clerk, may I have the presentation?  This is a

15  part of the record, it's a Document of 62.  That way Your Honor

16  doesn't have to go searching for it.

17       This is the Defendant's sentencing memorandum, the

18  minor solicited Mr. DePine to take pornographic pictures of the

19  minor.  Quote, "We were looking at this magazine and I wanted

20  to reenact some of the pictures so we took some pictures."

21       That's been the recitation.  That's the whole defense,

22  that she solicited the paragraphs and she wanted it.

23       Well, let's look at the actual interview because

24  statements have context and you need to take things into

25  context, respectfully, Your Honor.

1    If you look at 62-2, at the bottom of the page, the

2    actual interview, we see where she says that she wanted to

3    reenact some of the pictures.  But when asked what the magazine

4    was, the minor says, "I forget where he kept it.  It was one of

5    his erotic photography books."  It doesn't say Sports

6    Illustrated.  It says, "Erotic photography type books," like a

7    professional book.

8         "What were they doing?  What did you reenact?  Were

9    your clothes on or off?"

10        Their clothes were off.

11        "Where were they taken?"

12        "In his house."

13        "Where?"

14        "In his bedroom."

15        "Were you naked?" -- I'm sorry.

16        "You had your clothes off or on?"

17        When it was asked if they were off, she nods yes.

18        So the Defense can assert that she asked to have the

19   pictures taken.  The problem with that is, the erotic

20   photography book is provided by the Defendant.

21        The situational awareness of that is that they're in

22   his bedroom, naked.  He shouldn't have been in his bedroom with

23   a 15-year-old naked with an erotic photography book to begin

24   with.

25        But he wants to paint himself the victim, he was

1  seduced by the 15-year-old.

2          This case is different than others, but it is arguably

3  worse than others.

4          **THE COURT:**  "Others" in what context?

5          **MR. GOLDBERG:**  I'm glad you asked that.  That's my

6  next point.  Because this case is different than just plucking

7  someone off the street.  This is a case about a breach of

8  trust.

9          **THE COURT:**  How is this case different from so many of

10  the child production cases that we see?  I mean, obviously they

11  don't all have contact offenses.  Many do, though.  Because

12  that's what's charged here.

13          **MR. GOLDBERG:**  Correct.  What's different in this

14  instance that at least I have not seen before Your Honor is

15  surreptitiously picking up the victim in the middle of the

16  night, driving the victim back to a house for sex acts,

17  returning a victim back into bed before anyone is any the wiser

18  the next morning, repeatedly, over and over again.  Also,

19  PayPal money, providing her money, providing her clothes.

20          In the victim's statement she does say he provided her

21  a vibrator.  He denies that, but it's in her statement.  They

22  want us to believe some of her statement, I guess, but not all

23  of her statement.  So there are distinguishing factors.

24          I think the large one is the trust factor as well as

25  the gifts over and over again and the PayPal and the money.

1      And we do often talk about the spectrum of offender,

2  right?  So we have those at the bottom of the spectrum who are

3  viewing the child pornography or receiving it who may be

4  masturbating and deleting it.  And then we start working up,

5  what's more aggravating than that?  Someone who is traveling

6  maybe to engage in a sex act that one time and gets caught by

7  the police.  And then we continue up more the aggravating scale

8  of the spectrum and we have hands-on offenders.

9      Now, there are different grades of hands-on offenders.

10  I do not doubt that Mr. DePine may not be the worst hands-on

11  offender.

12      The Defense kept saying over and over again, you know,

13  with is little arm movement that, *They want to do this, they*

14  *want to do this.*

15      The Government doesn't recommend a sentence.  There's

16  nothing in any filing where the Government has recommended a

17  sentence.  The Sentencing Guidelines were provided by the

18  United States Probation Office, and they're an officer of the

19  Court.

20      The Guidelines are properly calculated, and the

21  Defendant is at the high end of the spectrum, because for

22  four-plus months he was violating a minor surreptitiously and

23  he took pictures of it.  She sent them to him, he kept them, he

24  cropped them, he edited them, he then sent her money, sent her

25  clothes, gave her a vibrator, and continued it on and on.

1    **THE COURT:**  But you must recognize that the Guideline

2    -- I think, actually, the top of the Guideline exceeds the

3    statutory maximum for Count Two.

4            **MR. GOLDBERG:**  That is correct.

5            **THE COURT:**  For a first-time offender.

6            **MR. GOLDBERG:**  Yes, Your Honor.  And that is because

7    it's a Chapter 4 calculation because he's considered under the

8    Guidelines an aggravated sexual offender or repeat sexual

9    offender because of all the different instances.

10           **THE COURT:**  But that is one of the criticisms --

11   probably the biggest criticism of the child sex offense

12   guidelines is that, for a first-time offender, the guideline

13   range just backs right up to the statutory maximum.

14           **MR. GOLDBERG:**  I've seen that argument quite often,

15   just as Your Honor has, certainly based on Chapter 2.  I would

16   assert that it's a little bit different under Chapter 4,

17   because, again, it's the multiple events that becomes the

18   problem.  It's not just, again, not that one act is okay, but

19   nine acts is worse, and that's what gives him the higher level.

20           And he -- what he's asking for -- and I'm not even

21   suggesting that the Court not vary slightly.  But what he's

22   requesting is a 50 percent variance.  I mean, that's what he's

23   asking for, a 50 percent variance because he's 63, depressed,

24   and a binge eater, or because he was seduced.

25           Well, in PSR paragraph 43, and he said it here again,

1    "We were just kids having fun."  That's a problem.  They're not

2    just kids having fun.  He was 62 years old.

3            And nowhere in any filing or in any argument has the

4    Government suggested he's a pedophile.  I am not suggesting

5    he's a pedophile.  Pedophilia is a diagnosis, and I've appeared

6    before Your Honor on many of those cases.  No one is suggesting

7    he's a pedophile.

8            But what I am suggesting is that their entire

9    argument -- it was -- the entire Defense's argument is about

10   specific deterrence.  But that is not the only purpose of

11   sentencing, as Your Honor is well aware.  That's one theory of

12   punishment.

13           Most importantly, Your Honor has to deter others -- 63

14   year olds, 61 year olds, 56 year olds, 51 year olds --

15   deterrence to stop others from engaging in sex acts with minors

16   and producing child pornography.  You have to promote respect

17   for the law, you have to pronounce a just sentence.

18           Even the Defendant's expert witness referred to the

19   minor as the victim here, because she is.  She was victimized

20   and there should be vindication of her rights as a victim.

21           I do think, just for purposes of record, because these

22   are real people we're talking about -- and I provided a copy to

23   the Defense -- I don't think I'm going to publish it.  I'm

24   going to ask that this exhibit, as well as the other exhibit I

25   provided to the Court, both be under seal.  I'm going to move

1    to admit Government Exhibit A, which is a photo of the victim,

2    because Your Honor should see she is a real person.  She's a

3    child.

4         May I approach Madam Clerk?

5         **THE COURT:**  Yes.

6         **MR. GOLDBERG:**  That's your seductress.  That your

7    Siren of Greek mythology who enchanted the Defendant to his

8    doom, that 15-year-old girl.

9         And in the Defendant's sentencing memorandum, he notes

10   the different penalties for receipt, production, and

11   distribution being less than these Guidelines.  But that same

12   United States Sentencing Commission -- and I know Your Honor is

13   aware of this -- in that mandatory minimum penalty book, this

14   is a hands-on multi-month sex offense.  It's not a one-day

15   aberration.  And the Sentencing Commission very much

16   distinguishes between contact sex offenses and straight child

17   pornography offenses.

18        The Defendant does not cite that in his memorandum.

19   But on page 2 of this document by the Sentencing Commission, it

20   specifically notes the differences.  And then on page 26, it

21   notes the average sentence, which is 263 months, which is much

22   different than what the Defendant cites in his sentencing

23   memorandum.

24        This is not a distribution case, this is not a

25   possession case, this is not a receipt case.  It's a production

1    case.  It is a hands-on offender who took pictures of it.  When

2    he received the pictures of it, he cropped them, he edited

3    them, and he continued to victimize the minor.

4         I just ask -- I simply ask that the Court recognize --

5    and I know this Court will -- that the Defense's entire

6    argument is about the victim as a seductress and specific

7    deterrence.  There are more important things to also consider

8    here.  General deterrence, respect for the law, and just

9    desserts.  Retribution is a theory of punishment that the

10   Supreme Court has accepted.

11        Now, is the Government asking for the Court to

12   sentence him to 30 years plus 10 more years for 40?  Of course

13   not.  I mean, it's legally allowable, but that's not what the

14   Government is asking for.  But he is a contact offender, and a

15   severe sentence for that is warranted.  Over months, a breach

16   of trust, plying her with gifts, calling her "Kitten" and

17   "Beautiful", trying to get her to have vaginal sex, even though

18   she's declining.

19        There should be something to deter others in this

20   sentence which is not simply a 50 percent variance off the

21   Guideline range.

22        On top of the sentence, as noted in prior argument,

23   the Government is going to formally move -- and if I may

24   approach Madam Clerk again -- for a final order of forfeiture

25   as to the items that were in the preliminary order of

1  forfeiture.

2        I will, for purposes of the record, let the Court

3  know -- and it is reflected in the motion as well as the final

4  order of forfeiture -- that I, as an officer of the Court, have

5  been in contact with counsel for the Navy Federal Credit Union.

6  That entity does have an innocent third-party interest in the

7  residence, and it's much lower than the value of the house.  So

8  there is specifically agreed upon language in the final order

9  of forfeiture that was crafted both by myself as well as

10  counsel for Navy Federal Credit Union to protect their interest

11  which will render their request for the ancillary hearing moot.

12        **THE COURT:**  All right.

13        **MR. GOLDBERG:**  May I approach?

14        **THE COURT:**  Yes.

15        **MR. GOLDBERG:**  And upon final adjudication, pursuant

16  to the plea documents, the Government would move to dismiss

17  Counts One and Three.

18        **THE COURT:**  All right.  Thank you.

19        Very briefly, Mr. McGee.

20        **MR. MCGEE:**  Yes, ma'am.  You asked at one point how

21  this case is different.  Let me describe how it's different.

22  This is man bites dog.  This is -- usually in these cases you

23  picture the dirty old man offering candy, liquor, drugs,

24  whatever to the young girl.  This is a case where the young

25  girl initiated the activity.  She had sexual fantasies about

1    him, she initiated it, and she acknowledges that she initiated

2    it.  She acknowledges that it was her fault.  She acknowledges

3    that she didn't want it to stop.  She's describes planning to

4    make her move and making her move to seduce Mr. DePine.

5           Mr. Goldberg says one of the things you need to do is

6    vindicate her rights as a victim.  Well, look at what she says

7    in the statement.  She says she wants no harm to befall this

8    man.  She repeatedly says she loves him.  She got a sexual

9    fantasy on this man and seduced him.

10          Now, that -- you were asked about what similar cases.

11   Tell me another pornography case -- cite one to me, anybody,

12   where the victim has decided she wants the man to have the

13   pornography and keeps sending it to him, where all of the

14   pornography is produced at the request or solely by the victim

15   in the case.  All the pornography in this case is her doing.

16   She's the one that sent every one of the pictures to him.

17          She doesn't want him harmed.  He did her -- he didn't

18   force her to do anything.

19          You know, and they don't like the use of the word

20   "seductress," but she is.  Look, she's sending him videos of

21   herself masturbating at home in her bed.

22          Now, they've got you a nice picture of her.  But what

23   they haven't shown you is the pictures she was sending to him,

24   naked pictures of herself, pictures of herself engaged in sex

25   acts.  She wanted to seduce him and this is part of the

1  seduction.  She's sending him the dirty pictures, the lurid
2  pictures in order to keep the relationship going and to seduce
3  this man.

4          Now, is that different?  Yes, that is different.  And
5  I defy Mr. Goldberg to come up with a case where that's
6  happened.  There's no case that I know of that that would be
7  the circumstances.  It is not the typical case.

8          Look, Mr. Goldberg says this case is about a breach of
9  trust.  Well, that's not the law, but it is in fact a breach of
10 trust, and Mr. DePine regrets that and has acknowledged it.

11         Mr. DePine acknowledges the relationship.  He
12 acknowledges it was inappropriate.  He acknowledges he
13 shouldn't have done it.

14         The issue is not whether Mr. DePine did anything
15 wrong.  The issue is whether Mr. DePine should spend the rest
16 of his life in prison for what he did.  I suggest to the Court
17 that that is unjust, unfair, and unworthy of a government of
18 the United States.  And I would ask you not to do so.  Thank
19 you.

20         **MR. GOLDBERG:**  Your Honor, for purposes of the record,
21 because I've been challenged, the case is Nicholas Peacock.
22 Your Honor just sentenced him to 28-and-a-half years.  The
23 victim sent pictures.

24         **MR. MCGEE:**  Judge, one final thing.  Mr. DePine has
25 family in the northeastern United States in New Hampshire.  He

1    would request that the Court designate, to the extent that you

2    have the power, that he serve any imprisonment that is imposed

3    by the Court at a facility close to his family's home in New

4    Hampshire.

5              **THE COURT:**  All right.  Thank you.

6              I'm going to take a recess.  I said I was going to --

7              **THE DEFENDANT:**  Your Honor, may I ask a question?

8              **THE COURT:**  What is it, Mr. DePine?

9              **THE DEFENDANT:**  I'm sorry.  But I'm just wondering

10   what was it about my case that required it to be held in

11   federal court?

12             **THE COURT:**  I can't answer that question for you.

13   Your attorneys will need to do that.  They can explain that to

14   you.  But I can tell you there is jurisdiction in this case.

15             I'm going to take a recess.  I'm going to look at

16   those cases and my notes, and I'll be back in and pronounce

17   sentence.

18             *(Recess taken 3:19 p.m. to 3:50 p.m.)*

19             **THE COURT:**  Regarding the objection to my considering

20   the images discovered or located in the unallocated space on

21   Mr. DePine's computer, the objection is overruled.  I'm going

22   to leave that factual information in the Presentence Report.

23   But I suppose it's sustained to the extent that I'm not going

24   to consider it myself.  I don't find it necessary to consider

25   it in this case.  I don't agree that the case law would

prohibit me from considering it.

Those images do not support a charge in this case. I would not make a finding of Mr. DePine as a pedophile. No one is asking me to make that finding, and I just don't find it necessary to consider those images. So that language will remain in the Presentence Report in terms of what was discovered, but it's not going to affect my sentence.

So this is not the typical child production case for a couple of different reasons. One of those reasons favors the Defense and another favors the Government. But it's not typical, first, because in many cases there are more images that are taken than we have here or we have images that are taken of younger victims or images that are taken without the victim's knowledge or consent.

But it's also not the typical child production case because here we have a hands-on sexual contact offense, and we don't see that in every child production case. Is it the case that sometimes we do see it? Certainly. But not of this nature.

So as far as the -- I'm going to talk about the sexual contact, because that really is, as I said earlier, the gravamen of this case.

I want to make one thing very clear at the outset of my comments, and this is clear as far as the Court is concerned, and that is, there is only one victim in this case.

1      And, Mr. DePine, that is not you.  There is only one

2  victim.  And that victim is not at fault in any way for what

3  happened to her.

4      I might be more persuaded by the argument that's been

5  presented here in terms of mitigation that -- in terms of

6  mitigation, I might be more persuaded by the argument that's

7  been presented that she was the initial sort of pursuer of the

8  relationship if there had been only one incident.  You'd still

9  be guilty, but I'd be more persuaded, again, in mitigation if

10  there had just been one incident.  But there were multiple, as

11  we know, there were multiple incidents of sexual contact with

12  this victim.

13      Mr. DePine, you were 47 years her senior, 47 years her

14  senior.  Instead of stopping the first incident, which, again,

15  you'd still be guilty, you'd still be looking -- if you had

16  taken the pictures, you'd still be guilty, you'd still be

17  looking at a 15-year mandatory minimum.

18      But you didn't stop.  This continued.  And the

19  suggestion that it continued all because she pursued you is not

20  supported by the record.  Again, you're 47 years older than

21  her.  But you also encouraged her.

22      I'm not going to go over all of the evidence with you.

23  It is very clear in the record -- I can see your look of

24  surprise on your face, but you did encourage her.  You used pet

25  names with her.  She's 15 years old.  You used pet names with

1   her.  You gave her money.  She's 15.  You gave her money.

2   You did -- and Mr. Goldberg pointed this out and it

3   was certainly not lost on me when I reviewed the record myself

4   -- you even encouraged intercourse with her when she expressed

5   some reluctance to that.  Now, thank God it never went that

6   far, and that is something that I will take into consideration

7   here.  But, again, that's not her pursuing you.  That is you

8   pursuing her.  And again, the money and the gifts are

9   problematic for me as well because that continues it, it

10  perpetuates it.

11  The presentation made here almost made it sound to me

12  like you wanted me to believe that you were not desirous of her

13  or you were not interested in her or even attracted to her.  I

14  mean, it's almost like the argument was that it was all her,

15  she came on to you super strong, again, you were the victim.

16  And that's not just the case.

17  Number one, again, there's the age disparity which

18  alone suggests her vulnerability.  But your attraction for her

19  was strong enough for you to violate the trust of someone

20  you've described as one of your very closest and dearest

21  friends.  You deceived him and his wife and, again, violated

22  their trust, destroyed that friendship all because you desired

23  this young girl.

24  By the conduct and what happened, you not only

25  destroyed your friendship with the Butts, but it's torn apart a

1    family.

2    Your allocution here today, I did not get the sense

3    that you have any real insight into why this was so wrong, even

4    now.  You said at the time you were -- I think it might have

5    been a statement to law enforcement where you said, "We were

6    just a couple of kids having fun."

7    I mean, even if I could accept that as far as your

8    perception of it at the time it was happening, today you must

9    see that that's not the case.

10   **THE DEFENDANT:**  That's not true.

11   **THE COURT:**  Okay.  Well, I did not get the sense from

12   you that you had a real insight into why this was so wrong.

13   And I understand you're unhappy about the laws that apply in

14   this case, but I guess that seems more to be your focus as far

15   as what's going on here is what's happening to you as opposed

16   to what's happened to her.

17   Now, in mitigation -- I mean, there are some

18   mitigating factors here.  As I noted, there was not

19   intercourse, and that's a very good thing.  You did not

20   physically harm her or even use any forceable conduct.  I

21   accept that.  I read her statement very carefully several times

22   and her journal entries.

23   Also, notably for the Court, you never distributed her

24   images, electronically or otherwise.  And so I certainly have

25   taken that into account.

1       The other things I've considered in mitigation,

2   Mr. DePine, are that you did cooperate fully with law

3   enforcement when you were first approached.  I noted what you

4   said to me as far as you turned over your pass codes to them

5   willingly, and you made statements without even the assistance

6   of counsel.

7       You are 63 years old now.  You are in poor health, I

8   recognize that.  I would also note that you are in poor mental

9   health.  You have had stable employment.  You've had a strong

10  support system and I'm sure will continue to have that.

11      You have no criminal history, not even any law

12  enforcement contact.  Nothing in the record to suggest any

13  similar behavior of the nature in this case in terms of any

14  kind of pursuit of any particular young female or minor.

15      Now, I can understand the family believing that that's

16  not the case.  I certainly can understand their feelings in

17  that regard.  But my decision can only be based on the evidence

18  in front of me, and there is no evidence, as I said, of any

19  similar behavior.

20      You've lost a very good job.  You have forfeited, as

21  part of your plea agreement -- and it would have happened

22  otherwise if there had been a jury trial and a guilty

23  verdict -- but you have forfeited your home as well as your

24  vehicle.  And it sounds like you have a significant amount of

25  equity in that home.

1          I also have read the letters that were submitted on

2     your behalf, the character letters, and did note with interest

3     and was impressed by your prior work on the Sterling Volunteer

4     Rescue Squad.

5          I also did take note in terms of the offense conduct

6     itself in terms of mitigation, I thought one of the strongest

7     in your favor things that I got out of the victim's statement

8     to law enforcement was that at some point you finally did

9     decide to end the relationship or determined to end the

10    relationship or wanted to end the relationship, and that was

11    something she did not want to happen or didn't want to occur

12    but you did, and I certainly took note of that.

13         The guideline range in this case is 23 or

14    23-and-a-half years to 30 years plus a few months, I believe.

15    The statutory maximum, as I discussed earlier, on Count Two,

16    which is really what's driving this sentence, is the 180 months

17    or 15-year mandatory minimum up to a 30-year of max.

18         So the maximum on Count Two, like I said, it's right

19    there with the top of the guideline range even for a first-time

20    offender.  But that tells us how seriously Congress and the

21    Sentencing Commission consider this type of behavior.

22         Actually, I said Count Two is what's driving this.  It

23    is driving this in terms of the mandatory minimum.  However, it

24    is the multiple instances of the pattern of conduct that really

25    pushed up the Guideline range in this case, and for good

1    reason.

2          So, as noted, the Guideline range of 23 -- basically

3    23 to 30 years.  I am going to vary from that Guideline range.

4    I believe I noted your age, but if I didn't, I should.  I'm

5    going to vary from it.  However, I'm not going to impose a

6    mandatory minimum sentence, based on the facts that I've just

7    gone over with you that I find aggravating.

8          The sentence that I'm going to impose is an 18-year

9    sentence.  That is 216 months.  And again, that is, in large

10   part, due to your age and your physical condition.

11         I will recommend a facility as close to New Hampshire

12   -- if you know of one, I'll be happy to recommend a specific

13   one.  I'm not aware of any facilities in that part of the

14   country.

15         **MR. MCGEE:**  I'm not familiar with the prisons in that

16   area.

17         **THE COURT:**  I do not have -- excuse me?  Do you know

18   of an institution?

19         **UNIDENTIFIED PERSON:**  I thought we agreed on Berlin.

20         **MR. MCGEE:**  There's a prison close to Berlin, but I

21   don't know what the category is.

22         **THE COURT:**  Is that a prison camp, do you know?

23         **UNIDENTIFIED PERSON:**  I don't know what the category

24   is but --

25         **UNIDENTIFIED PERSON:**  I read about it.  It's a -- what

1    do you call it, medium?

2             **MR. MCGEE:**  Medium security.

3             **UNIDENTIFIED PERSON:**  A medium, and it also has a

4    minimum.

5             **THE COURT:**  Okay.  Well, I don't have a problem

6    recommending Berlin.  I will do that.  I don't know what the

7    classification level is of the facility.  And the Bureau of

8    Prisons actually is the entity that will make the designation

9    decision, not me.  I don't have the authority to do that.  I

10   can just make a recommendation.  The Bureau of Prisons will

11   follow it, if they can.

12            Obviously, they take a number of factors into account

13   when determining where to designate someone for service of a

14   sentence, and my recommendation is just one of those things

15   they'll take into account.  But they will consider it, and so I

16   will make that recommendation.

17            We did not discuss, counsel, the issue of restitution.

18   I don't believe there is a matter of restitution outstanding.

19            **MR. GOLDBERG:**  No, Your Honor.  None of the victims

20   have requested restitution and, pursuant to law, that is

21   required.  The United States Attorney's Office inquired, and

22   there has been no requests, so restitution is not necessary in

23   this case.

24            **THE COURT:**  Okay.  As far as a fine or financial

25   penalty, Mr. DePine has lost his job, he has forfeited his

1 home, he's forfeited his vehicle.

2 But my issue and the probation office's issue --

3 really this is to you, Mr. McGee -- is I don't know how to make

4 a determination that he is unable to afford payment of a fine

5 because I understand there was not a lot of cooperation with

6 probation in terms of financial information.

7 **MR. MCGEE:** If I may clarify that?

8 **THE COURT:** Yes.

9 **MR. MCGEE:** Mr. DePine was locked up in the Santa Rosa

10 County jail. The Government took his wallet with all his

11 credit cards and took his computers which had his financial

12 records on them. His brother Joseph was charged with the task

13 of figuring out his financial records and it is not an easy

14 task to do. But he came up with numbers and I took those

15 numbers out to Mr. DePine and there were errors in them.

16 I offered to give the probation office what we could

17 agree on but there were errors, for example, in the credit card

18 bills, and there were errors in how much he paid monthly for

19 his house. And he had none of the -- he did not have the

20 ability to have those underlying records at the jail.

21 So the point is, there was significant effort to

22 gather those financial records. It proved to be ultimately

23 impossible to get them in time. We couldn't get -- when we

24 wanted to get the credit cards and access to them, the marshals

25 office told us they couldn't find the wallet at first, and we

1   didn't get the wallet until a few weeks ago, and the wallet had

2   the credit cards in it and we needed those.  And the materials

3   that were searched from his house had the code -- had the

4   passwords on his computers to get into the financial records.

5   It took a very long time and a lot of effort went into trying

6   to find them.

7           So we tried very hard to do it, offered them what we

8   had, and they said, well, if you can't swear to everything,

9   don't give us anything.  That's what I was told.  But he has

10  lost -- he has no employment, he's lost his home, he's lost his

11  car.  He has very little left in this world.

12          **THE COURT:**  Well, I don't know.  Does he have --

13          **MR. MCGEE:**  There is a retirement account.  And I

14  think there may be a few dollars other than the retirement

15  account, but the retirement account is the bulk of what he has

16  left, and it's in one of those protected IRA things.

17          **THE COURT:**  Mr. Goldberg, do you have a position?

18          **MR. GOLDBERG:**  I defer to the Court, Your Honor.  The

19  Government is taking his home and his car because they were

20  both utilized to facilitate the offense.  But the Defendant

21  does have funds, we know, in the retirement account.  I'm not

22  suggestion a Guideline fine sentence is required, but some sort

23  of fine is certainly suggested, but I defer to Your Honor.

24          **THE COURT:**  Let me ask, do you know, Officer Pearce,

25  is it a mandatory of $50,000 absent me making a finding that

1  he's unable to pay, that he's indigent?

2  **U.S.P.O. PEARCE:**  Your Honor, the Guideline fine would

3  be a minimum of $50,000.

4  **THE COURT:**  Is there a statutory fine?

5  **U.S.P.O. PEARCE:**  There is not a statutory minimum

6  fine, no, Your Honor.  In most instances, if we had simply

7  known what was in the retirement account -- we don't

8  necessarily need to know what the credit cards were.  We could

9  run a credit report for that.  We just couldn't even assess how

10  much assets the Defendant had.  So, in that event, we put in

11  the report that we weren't able to determine what his net worth

12  was.  If we had had an indication of what his net worth is,

13  $100,000, $500,000, whatever that is, we would be able to

14  assess whether or not he could afford to pay a fine.  But to

15  answer your question, I believe it's just a Guideline issue,

16  it's not a statutory requirement.

17  **THE COURT:**  All right.  Thank you.

18  The $5,000 under the Justice for Victims of

19  Trafficking Act, that is mandatory, am I correct, without a

20  finding of indigency?

21  **U.S.P.O. PEARCE:**  That would be correct, Your Honor.

22  **THE COURT:**  All right.  So that's a $5,000 assessment.

23  There's also required an assessment under 18 U.S.C. 2259A, and

24  I can set that at whatever level I want to set it at.

25  All right.  What I'm going to do, like I said, there's

1  a -- I'm not able to make a determination that he's indigent.

2  I don't have the ability to do that on this record.  So the

3  Justice for Victims Trafficking Act assessment is $5,000.  The

4  2259A I'm going to set at $1,000.  And then I'm going to impose

5  a $4,000 fine.  And between the special assessments and the

6  fine, it's $10,000.

7            I'm not going to impose a Guideline -- and the

8  Government is not asking for it -- of $50,000 up to $500,000,

9  given the forfeiture.

10            Mr. DePine, I do need to formally pronounce your

11  sentence.  If you would, please rise.

12            **THE DEFENDANT:**  Excuse me?

13            **THE COURT:**  I'm sorry.  I need to formally pronounce

14  your sentence, if you would please rise.

15            *[Defendant complies.]*

16            Mr. DePine, at this time, the Court does formally

17  adjudicate you guilty of Counts Two and Four of the indictment.

18  That's consistent with your plea of guilty to those charges.

19            Mr. Goldberg, the Government has moved to dismiss

20  Counts One and Three?

21            **MR. GOLDBERG:**  Yes, Your Honor.

22            **THE COURT:**  And that will be granted.  Those counts

23  will be dismissed.

24            At this time, I do determine that the Presentence

25  Investigation Report in Mr. DePine's case is accurate.  I order

1    the findings of the report incorporated into the following

2    sentence:

3            Mr. DePine, pursuant to the Sentencing Reform Act of

4    1984 and all amendments to that law, it is the judgment of this

5    Court that you are hereby committed to the custody of the

6    Bureau of Prisons to be imprisoned for a term of 216 months as

7    to Count Two and 60 months as to Count Four, with those to run

8    concurrent one with the other.

9            This sentence I do believe appropriately addresses the

10   seriousness of the offenses in this case as well as the history

11   and characteristics of you, Mr. DePine.

12           I do find that the sentence is sufficient but not

13   greater than necessary to meet the goals of sentencing, which

14   do include punishment as well as general deterrence.

15           I have carefully considered all of the factors in 18

16   U.S.C. 3553(a) in arriving at this sentence, and I do find at

17   this time, based upon the unique facts and circumstances of

18   your case, including the offense conduct as well as your

19   history and characteristics, that it is a just sentence, and it

20   certainly does respect the mandatory minimum required by law.

21           I'm going to allow you to be seated now.

22           At this time, the Court does impose a financial

23   penalty or a fine in the amount of $4,000.  I will waive

24   interest on that amount.  In addition to the fine, there are

25   two special monetary assessments that are nonwaivable and

1    mandatory.  One is under 18 U.S.C. 2259A, and that is in the

2    amount of $1,000.  The other is under the Justice for Victims

3    of Trafficking Act, and that is in the amount of $5,000.  There

4    is also a special monetary assessment pursuant to 18 U.S.C.

5    3013 of a total of $200.  It's $100 for each of the two felony

6    counts of conviction.  That is due and payable immediately.  No

7    restitution has been requested or will be ordered in this

8    matter.

9         Now, given the length of the sentence in light of

10   Mr. DePine's age, the Court is going to impose a period of

11   supervision at the mandatory minimum of five years.  Mr. DePine

12   will be in his eighties, and I also am taking into account the

13   testimony of Dr. Kline in this case, and I believe he poses a

14   low risk of recidivism, and therefore I'm going to only impose

15   the five-year mandatory.

16        Now, you will be on supervised release for a term of

17   five years, and that will run concurrent both on Counts Two and

18   Four.  Supervision will be under the mandatory and standard

19   conditions adopted for use in this district together with

20   certain special conditions.  Those special conditions are

21   outlined in paragraphs 102 through 108 of the Presentence

22   Investigation Report.  I'm not going to detail them here.

23   They're in the report.

24        The one that I do want to specifically make note of

25   with you now, Mr. DePine, is your requirement that you register

1    as a sex offender.  Regardless of how you see yourself or view

2    yourself or how your family views you, by law you are a

3    designated sex offender.  And the biggest way to get into

4    trouble is to fail to comply with those registration and

5    notification requirements that are set by law.  So please do be

6    mindful of that.

7          I'm also, at this time, specifically recommending to

8    the Bureau of Prisons that you be designated to the Federal

9    Correctional Institute in Berlin, New Hampshire, for service of

10   this sentence.  And again, I'm not sure of the security level

11   of that facility.  But even if it is a minimum security camp, I

12   have no problem with you serving your sentence at a camp given

13   what I know about your criminal history or lack of criminal

14   history and lack of propensity for violence.  I don't have a

15   problem with a camp.  I can't tell you how the Bureau of

16   Prisons will view that, though.

17         The total sentence, Mr. DePine, in your case is 216

18   months, a term of supervised release of five years or 60

19   months, a fine of $4,000, a special monetary assessment of

20   $200, other monetary assessments for a total of $6,000.

21         In addition, the Court does hereby order your interest

22   in the real property located at 5604 Lobelia Lane in Pensacola,

23   Florida, as well as your interest in the 2016 Lexis, VIN number

24   as outlined in this final order of forfeiture, as well as

25   several items of electronic equipment, your interest in those

1   as well is hereby forfeited to the United States.  The final

2   order of forfeiture is entered but this should be incorporated

3   into the judgment as well.

4       Mr. McGee, other than the arguments that have been

5   made and presented here in open court, is there anything else

6   you'd like to say at this time?

7       **MR. MCGEE:**  No, ma'am.

8       **THE COURT:**  Mr. Goldberg?

9       **MR. GOLDBERG:**  Your Honor, the only thing I would

10  request, and I believe I had this conversation with the United

11  States Probation Office, it's not in paragraphs 102 to 108 but

12  I would ask that one of the special conditions of his

13  imprisonment and his release is that he have no contact forever

14  with the victim of this crime.

15      **THE COURT:**  Yes, that is also a condition, and that's

16  my error for overlooking it.  Thank you.

17      Specifically, Mr. DePine, one of the special

18  conditions in addition to those that are outlined in the

19  Presentence Report is that you are prohibited from having any

20  contact with the victim in this case, whether direct or

21  indirectly, for forever.  You may not have any contact with

22  her.

23      **U.S.P.O. PEARCE:**  Your Honor, regarding the special

24  conditions, is there any fine amount -- a monthly payment that

25  he should be paying the fine amount while he's on supervised

1 release?  Paragraph 108A --

2       **THE COURT:**  That is so hard to determine at this point

3 in time, but I'm going to set it at $250 a month for right now.

4 If that needs to be changed or altered on Mr. DePine's release,

5 then that can be made known to the Court, whether greater or

6 lesser, depending on his financial circumstances at that time.

7       **U.S.P.O. PEARCE:**  And Your Honor, just for the record,

8 in paragraph 108 it specifically dealt with restitution being

9 an issue.  But in this case we do not have restitution, so

10 those conditions would simply be changed to the fine payment

11 not the restitution payment.

12       **THE COURT:**  Thank you.  That's accurate.

13       Mr. DePine, you do have the right to appeal from this

14 sentencing decision.  If you choose to do so, your notice of

15 appeal must be filed within 14 days of the date of the Court's

16 written judgment, not today's date.

17       The sentence that I have just orally pronounced will

18 be put into writing, it will be filed in our court records

19 sometime in the next week to two weeks -- hopefully maybe not

20 two weeks, but a week or so.  Your time to appeal, if you

21 choose to do so, begins to run from that date, not today's

22 date.

23       I know that Mr. McGee and Mr. Schaffnit and Mr. Massey

24 will talk to you further about your appeal rights, but do keep

25 in mind the 14-day window is strictly enforced, and if you

1  intend to challenge the Court's decision on appeal, you need to

2  do so within that time frame.

3          Otherwise, is there's anything else from anyone?

4          *[No response.]*

5          No?  The Court is in recess.

6          **(Proceedings concluded at 4:22 p.m.)**

7                  --------------------

8  *I certify that the foregoing is a correct transcript from the*
   *record of proceedings in the above-entitled matter.  Any*
9  *redaction of personal data identifiers pursuant to the Judicial*
   *Conference Policy on Privacy are noted within the transcript.*

10

11  *s/Donna L . Boland*                    *10-25-2019*
    *Donna L. Boland, RPR, FCRR*            *Date*
12  *Official Court Reporter*

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

**PAGE**

**WITNESSES FOR THE DEFENSE:**

*SUZONNE KLINE*
   Direct Examination by Mr. Schaffnit                 5

CERTIFICATE OF REPORTER                              110


                    DEFENDANT EXHIBITS

        1:  Binder of Record Documents               35